## **EXHIBIT A**

1. Complaint, filed on or about July 16, 2019.

2. Superior Court Case Information Sheet, July 16, 2019

3. Initial Order and Addendum, dated July 17, 2019.

4. Summons, issued July 19, 2016.

5. Amended Complaint, filed on or about July 31, 2019

6. Affidavit of Service, filed on or about August 12, 2019

7. Case Details (electronic docket), as of August 26, 2019.

**EXHIBIT 1**

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

-------------------------------------------------

| | |
|---|---|
| RAED JARRAR ) | |
| 3355 16th St NW ) | |
| Apt 401 ) | |
| Washington, DC 20010 ) | |
| ) | No. |
| Plaintiff, ) | |
| ) | JURY TRIAL DEMANDED |
| v. ) | |
| ) | |
| AMNESTY INTERNATIONAL ) | |
| OF THE USA INC ) | |
| 600 Pennsylvania Avenue SE ) | |
| Suite 500 ) | |
| Washington, DC 20003 ) | |
| ) | |
| Defendant. ) | |

**COMPLAINT**

<u>INTRODUCTION</u>

1.    Plaintiff Raed Jarrar ("Plaintiff") brings this complaint against Amnesty International of the USA ("AIUSA") for acts in violation of DC Code Sections 2-1402.11(a)(1) (discrimination and retaliation because of race, gender, national origin, and religion), 2-1402.61(a) and (b) (discrimination and retaliation for opposing unlawful practices) and 2-1402.62 (aiding and abetting unlawful acts); and DC Code Section 32-1311 (discrimination and retaliation for advocating against wage theft and wage and hour violations); defamation under the common law

1

of the District of Columbia; invasion of privacy – false light under the common law of the

District of Columbia; and intentional infliction of emotional distress under the common law of

the District of Colombia.

2.      The Plaintiff brings a private cause of action under DC Code Section 2–1403.16

(discrimination, retaliation and aiding and abetting) and DC Code Section 32–1308(a)(1)(A).

3.      The Superior Court of the District of Columbia has jurisdiction over these claims in

accordance with DC Code Section 11–921.


## VENUE

4.      Venue is proper in this Court because all or a substantial portion of the events that gave

rise to Plaintiff's claims took place in the District of Columbia, including the acts of

discrimination and retaliation and publication or republication of defamatory falsehoods, the acts

placing the Plaintiff in a false and defamatory light, intentional infliction of emotional distress

and the damage to Plaintiff's reputation.


## PARTIES

5.      Plaintiff was employed by Defendant AIUSA in 2017 and 2018 in Washington, DC.

Plaintiff lives in Washington, DC.  He is a male whose race is Arab, whose national origin is

Palestinian and Iraqi, and whose religion is Muslim.

6.      Defendant AIUSA is a not-for-profit organization incorporated in the State of New York,

with its main places of business in New York, NY; Washington, DC; Chicago, IL; Atlanta, GA;

and Oakland, CA. Since its foundation in 1966, the United States branch of the organization has

worked to free prisoners of conscience, oppose torture, and fight other human rights violations

around the world. According to its stated purposes, it seeks to promote human rights in the

United States through lobbying and education and describes itself as working for full human

rights for everyone. Defendant AIUSA is has over 350,000 members.

FACTS

7.    BDI Coaching and Consulting is a NY-based company that provides human resources services to AIUA. At all material times with respect to the conduct of its agent alleged in this complaint, it was acting as an agent of Defendant AIUSA.

8.    Fenton Communications is a public relations firm, which maintain offices in Washington, DC, San Francisco, and New York City. At all material times with respect to the conduct of its agents, it was acting as an agent of Defendant AIUSA.

9.    At all material times, Becky Farrar was the Chair of Defendant AIUSA's Board of Directors and an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

10.    At all material times, Margaret Huang was the Executive Director of Defendant AIUSA, and an agent of Defendant AIUSA with respect to her conduct alleged in this complaint. Huang works in Washington, DC, and is the highest-ranking employee within Defendant AIUSA. Huang manages Defendant AIUSA, along with an executive team comprising unit and group managers.

11.    At all material times, Amanda Simon was the Interim Deputy Executive Director, Public Affairs of Defendant AIUSA, and was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

12.    At all material times, Joanne Lin was National Advocacy Director of Defendant AIUSA and Plaintiff's immediate supervisor. She was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

13.    At all material times, Bart Ianantuoni worked for BDI Coaching and Consulting, and held the position of Chief People Officer, HR Consultant and Coach. Ianantuoni was the Defendant AIUSA's interim head of human resources and was an agent of Defendant AIUSA with respect to his conduct alleged in this complaint.

14.    At all material times, Ben Wyskida was the CEO of Fenton Communications and was an agent of Defendant AIUSA with respect to his conduct alleged in this complaint.

15.    Plaintiff started his position as the Middle East and North Africa Advocacy Director at Co-Defendant AIUSA on September 11, 2017. While working in this position, Plaintiff's responsibilities included meeting with U.S. government officials to advocate on issues involving the Middle East and North Africa, speaking to the media to convey reports and analyses, and

authoring blogs and op-eds. His salary was approximately $98,000 per year. Out of over 100 Defendant AIUSA employees at the time of his employment, Plaintiff was the only Arab-American and Muslim-American male working for Defendant AIUSA.

16.     As more fully described below, Plaintiff led an internal petition protesting Defendant AIUSA's practice of employing unpaid interns, protesting the discriminatory aspects of the practice of employing unpaid interns, and calling on management to pay Defendant AIUSA's interns. Following Plaintiff's advocacy, Defendant AIUSA defamed, placed in a false light, discriminated against and retaliated against, and intentionally inflicted emotional distress on, Plaintiff. Immediately after organizing the petition, Defendant AIUSA suddenly began to scrutinize Plaintiff's work. Defendant AIUSA then investigated him four times in the course of two months. Defendant AIUSA placed Plaintiff on indefinite administrative leave, then terminated him on July 20, 2018. Plaintiff did nothing to justify Defendant AIUSA's actions and was not guilty of any offence for which Defendant AIUSA investigated him, suspended him and terminated him. Defendant AIUSA, among others, further discriminated and retaliated against Plaintiff by causing the withdrawal of a grievance protesting his termination from arbitration after he filed a charge with the Equal Employment Opportunity Commission.

17.     Plaintiff was a member of Communications Workers of America, Local 1182 ("the Union") since he began his employment with Defendant AIUSA. On March 16, 2018, he joined the Union's negotiating team that was bargaining for a successor collective bargaining agreement.

18.     For his probationary employee evaluation review on April 9, 2018, Plaintiff was rated with "exceeds expectations" and received a promotion and raise. He had an exemplary performance record. Members of Defendant AIUSA's senior management team and organizational volunteers also reported to him that Defendant AIUSA considered his performance to be outstanding. Throughout his employment until this time, there was not a single investigation into his conduct by management.

19.     In her review, Lin stated: "[I]n his seven months on the job, Raed has fulfilled and exceeded all expectations on responsibilities 1-6. On his own initiative, he took on responsibilities 7-8, which weren't being properly attended to by other staff. In recognition of these new duties, I amended his job description and increased his salary accordingly."

20.    One of Plaintiff's colleagues thanked him for his work by stating, "You have been a smart, creative, and respectful colleague, and I am grateful to you for providing the best MENA AD experience I've had in at least 15 years - probably 20."

21.    In February 2018, a group of interns working in the Washington DC office of Defendant AIUSA approached him with complaints that they were not being compensated for their work. Plaintiff had several conversations with these interns and advised them to submit a petition requesting compensation for interns. Plaintiff assisted the interns with drafting a petition by providing feedback and editing.

22.    On April 2, 2018, Defendant AIUSA's government relations unit held its weekly meeting. Approximately ten staff, including Plaintiff, participated in the meeting. During this meeting, Huang shared the results of an annual employee satisfaction survey. After the presentation, she invited questions and Plaintiff raised the complaints of the interns about their not being paid for their work. Plaintiff suggested that Defendant AIUSA consider paying its interns and articulated the applicable principles and moral grounds justifying a change in the unpaid internship policy. Huang said that she will be meeting with the executive team that weekend to discuss the issue.

23.    On that same day, Plaintiff encouraged the interns to finalize the deliver the petition containing their concerns immediately, and he helped gather signatures from staff at the Defendant AIUSA DC office in support of the action of the interns.

24.    On April 3, 2018, the interns delivered the petition to Huang.

25.    Among other things, the petition addressed equal opportunity employment based on the fact that offering only unpaid internships leads to a lack of racial diversity in the intern pool. It stated (emphasis added):

> "Providing compensation for internships would demonstrate true commitment to making Amnesty **an equal opportunity employer and creating a diverse workplace**. Amnesty International's commitment to human rights should be proven from within first. It is a basic human right to be able to seek employment and the lack of monetary compensation in this position restricts the ability to carry out that right. **Without pay, Defendant AIUSA's internships are more available to students of higher socioeconomic status, which serves to limit racial and socioeconomic diversity.** In order to create a more diverse and varied

> work environment it is imperative that Amnesty help include those people who
> cannot afford to live with a fair and standardized pay."

26.     On April 9, 2018, Huang and Ianantuoni met with the DC office interns. Huang informed them that in response to their petition Defendant AIUSA will start paying interns for the fall 2018 term. That change, however, had no bearing on the interns in attendance.

27.     On the same day, April 9, 2018, Huang and Ianantuoni met with staff who signed the petition, rebuked them, and threaten them with reprisal for their participation in concerted organizing. In response to Huang, during that meeting more than one staff member mentioned Plaintiff's role in leading the petition effort.

28.     Huang informed the employees that Defendant AIUSA would be implementing a paid internship program. However, rather than having 40-50 interns at any given time, Defendant AIUSA would hire only three paid interns for all of Defendant AIUSA. The Washington, DC, office would end up with one intern instead of the usual average of fifteen. Her announcement evoked complaints from employees who relied on interns for their programs. Huang said she was disappointed because she had an open-door policy and would have expected employees to discuss their concerns with her or request a meeting with the executive team before resorting to a petition. She characterized the employees' action as aggressive and litigious. Regarding the impact of the loss of intern support on employees, she said that employees would have to reset their program goals with the likely reduction in the number of projects that they could satisfactorily undertake. Ianantuoni weighed in during the meeting to support Huang, commenting that he at one point had himself been an unpaid intern.

29.     During the meeting between staff and Huang, she made statements such as the following: "Next time, you shouldn't sign petitions. Rather, you should request a meeting with me." She further stated that sending petitions was "hostile by nature." She informed staff that the petition was "adversarial" because she believed it contained threats of litigation. She told staff that she felt blind-sided that no one told her that there was a petition in the making. She asserted that she thought that they were all friends and that it made her sad that nobody warned her about this petition. Regarding the reduced number of interns, Huang stated: "I know that you all rely on interns to do your work and now we will end up with one intern at the DC office. So, I do not know how you will manage to do your work, but that's what happened."

6

30.     During this meeting Plaintiff spoke up and indicated that he thought the meeting had started on the wrong tone. He stated that the way the decision to cut interns to only one at the DC office appeared punitive. He pointed out that three interns appeared to be an artificially low number and that there were other financial options for funding more interns. He explained that the petition did not include any threats of litigation. He suggested that they restart the meeting on a better note and observed that Defendant AIUSA frequently utilizes the tactic of signing and sending petitions.

31.     After working hours on April 9, 2018, unionized staff met in person at a nearby restaurant. Most staff at the meeting expressed fear of reprisal from management.

32.     On or about April 9, 2018, Huang met with Plaintiff's supervisor Lin,  and complained about Plaintiff "spearheading" the petition efforts and his participation in the Union negotiating team of which Plaintiff was a member. Plaintiff viewed the meeting as retaliatory and discussed his concerns with his Union shop steward, Emily Walsh.

33.     On April 11, 2018, Union shop steward Emily Walsh sent an email to Defendant AIUSA summarizing what happened on April 9, 2018. The email read: "This meeting has been described as hostile, to the extent that staff in the room felt fearful of retaliation just for this gesture of support," and that "Staff responded as much as possible, given the temperature of the room and fear of retaliation [...] With great surprise at this sudden decision." Walsh's email concludes with reassuring staff: "I want to make it clear that anyone who feels retaliated against, intimidated, etc. because of this is encouraged to talk to a Shop Steward. The union is behind us 100%."

34.     On April 12, 2018, Union shop steward Emily Walsh sent another email to all unionized staff reassuring them that: "If you signed on to the letter, please know that you are completely protected against retaliation."

35.     On April 13, 2018, Plaintiff emailed his Union shop stewards to follow up on his concerns pertaining to Huang's meeting with his supervisor on April 9, 2018. Plaintiff's email read: "I'm a bit concerned about a meeting that took place between Margaret [Huang] and my boss, Joanne [Lin], this week." Plaintiff explained that Huang discussed some issues with his supervisor Lin, including that "she seems to believe that I 'spearheaded' the petition work" where "some staff (according to her) felt pressured to sign." Plaintiff expressed the hope that this was not done in retaliation for his role in the interns' petition.

36.     The Union was concerned about retaliation for Plaintiff's role with the interns' petition and arranged a meeting between Plaintiff and Huang. The meeting did not take place until May 9, 2018.

37.     During the week of April 9, 2018, Defendant AIUSA informed Plaintiff was that he no longer was allowed to hire a pre-approved fellow to work on human rights issues in Egypt. Before the intern petition, Plaintiff had helped secure a large donation toward his work on Egypt. He had conversations with the Development and Finance departments at Defendant AIUSA on ways to spend the money, and one of the ways suggested by both was to hire a fellow. This is something that his predecessor has done with similar restricted funds. After the delivery of the petition to Defendant AIUSA, however, Huang informed Plaintiff's supervisor Lin that Plaintiff was not permitted to use the money to hire anyone. Huang referenced the interns' petition and subsequent cuts in interns as the reason behind her decision.

38.     Also during the week of April 9, 2018, immediately after the delivery of the petition to Defendant AIUSA, Lin informed Plaintiff that she had received emails and calls from Zeke Johnson, a manager from another Defendant AIUSA unit, requesting an urgent meeting with her to discuss concerns about Plaintiff. The concerns were regarding Plaintiff's "negative gender dynamics" with Daphne Eviatar, a New York-based Defendant AIUSA employee. Lin asked Plaintiff what was going on, he told her that he had no idea.

39.     A few days later, Lin called Plaintiff into her office. She told Plaintiff that Johnson contacted her about the issue and that it seemed serious. Lin told Plaintiff that Johnson had raised vague concerns about Plaintiff's "negative gender dynamics" while working with Daphne Eviatar. Lin instructed Plaintiff to reach out directly to Eviatar to clear up the situation.

40.     On or around April 16, 2018, after being instructed to do so by Lin, Plaintiff called Eviatar and informed her that he was calling in relation to alleged concerns regarding "negative gender dynamics." Eviatar told Plaintiff that she had not complained to anyone about him. She assured him that there was nothing wrong with their working relationship. Plaintiff suggested that Lin meet with Eviatar and Johnson alone to discuss the issue. Lin met with them at a later date in New York and confirmed Eviatar had not complained about Plaintiff.

41.     On April 16, Lin informed Plaintiff that he was under a second investigation for possibly influencing the work of the International Secretariat, a sister organization of Defendant AIUSA where his fiancée at the time, Alli McCracken, worked. Defendant AIUSA accused Plaintiff of

influencing McCracken's work and leaking information to the International Secretariat.
Defendant AIUSA later questioned Plaintiff, and Huang instructed other staff members to send
her their notes of any interactions with Plaintiff that pertained to the investigation. Defendant
AIUSA later instructed Plaintiff to provide copies of all his emails and other interactions
surrounding the project to Njambi Good, the Deputy Executive Director at Defendant AIUSA
who reported directly to Executive Director Huang and was tasked by Huang to lead the inquiry.
In the presence of his supervisor Lin, Good questioned Plaintiff. Plaintiff denied any allegations
of influencing his fiancée's work.

42.     On April 24, 2018, Plaintiff participated in a Diversity, Equity and Inclusion ("DEI")
hiring panel at the office of Defendant AIUSA. That next day, Plaintiff went on leave for two
weeks for his wedding and honeymoon.

43.     Upon his return, on or about May 8, 2018, Lin informed Plaintiff that he was under a
third investigation because, according to upper-management, "a couple of women colleagues"
had complained about Plaintiff's "negative gender dynamics" during the DEI hiring panel.
Plaintiff was shocked to hear that he was under yet another investigation. Lin told Plaintiff that
Good wanted to meet to discuss the ongoing investigation.

44.     Plaintiff realized that there was a pattern of repeated false allegations and investigations
and decided to record all further conversations with management.

45.     On May 9, 2018, Plaintiff finally met with Huang to discuss the internship petition and
his concerns of retaliation. This meeting was requested by the Union in mid-April, 2018.
Plaintiff recorded most of that conversation on his telephone. During this conversation, Plaintiff
expressed concerns that he had been scrutinized and targeted with a series of investigations after
his role with the petition. Huang repeated many of the threats she made in the April 9, 2018
meeting.

46.     On May 13, 2018, Good emailed Plaintiff's wife Alli Jarrar [née McCracken]. Although
Plaintiff had complied with all instructions and denied influencing his wife's work, Good wrote
to Ms. Jarrar, shared private information about the second investigation of Plaintiff, and brought
up the same allegations.

47.     In that same exchange on May 13, 2018, Good told Plaintiff: "if you feel that I am part of
the miscommunication, please feel free to go to Margaret [Huang] directly." Plaintiff was
surprised to hear that Huang had ordered the inquiry herself.

48.     On May 15, 2018, Plaintiff had a video conference meeting with Good. On information and belief, Good was in Atlanta, GA at that time. Plaintiff recorded the conversation. Good informed Plaintiff that she led the inquiry and that she had watched a video of the DEI panel, which had been recorded. She noted that Plaintiff was between six and seven minutes late to the panel. She said that she had contacted female colleagues to investigate their version of events pertaining to the alleged problem of gender dynamics issues. Plaintiff and Good engaged in a 15-minute conversation, during which Plaintiff asked Good about the possibility of obtaining permission to reveal the identity of the individual(s) who allegedly made the gender-related complaint against Plaintiff that initiated the third investigation. Eventually, Good admitted to Plaintiff that it was Danny McGregor, a top-level Defendant AIUSA manager who was not a part of the panel. Good told Plaintiff that McGregor contended, after watching a recorded video of the panel, that Plaintiff created a negative gender dynamic during the panel.

49.     Good then stated that she had watched the tape and that she was "on the fence" about the alleged negative gender dynamic issue.

50.     Plaintiff expressed concern that this was the second time in a month where a white male had complained about him, allegedly on behalf of female colleagues, referencing the first investigation initiated by Johnson.

51.     Plaintiff perceived that Defendant AIUSA was applying a prejudiced stereotype of Muslim men or men of Arab descent to him. Plaintiff was shocked to discover that Defendant AIUSA management had lied about the complaint as having come from female colleagues and that no women had actually filed complaints against him.

52.     Shortly after the meeting, still on May 15, 2018, Plaintiff met with Lin in her office. Lin expressed surprise that McGregor had filed the complaint because she said that she was told that the complaint was made by two of Plaintiff's female co-workers.

53.     On May 17, 2018, Plaintiff exchanged several emails with Good. Even though Good had admitted to Plaintiff two days earlier that no women had filed complaints against him and that she was "on the fence" regarding the negative gender dynamic allegations, Good told Plaintiff: "[I] noted the same things when I watched the [DEI hiring panel] and when I heard about tensions with you and Daphne [Eviatar]." When Plaintiff learned that Good was aware of the false allegations made against him about negative gender dynamics with Eviatar, he concluded

that this investigation was another part of the broader pattern of retaliation against him carried out by the highest levels of management.

54.     That same day, Plaintiff expressed serious concerns in two separate emails to Good regarding the second and third investigations: "The assumption that I would control my wife, speak on her behalf, or pressure her to do things for my political agenda might be rooted in Islamophobia and negative stereotypes about Arab-American and Muslim-American men. The assumption that I have a hidden agenda that would push me to leak information to the [International Secretariat] about our work or hide information from my colleagues is in the core of Islamophobic theories that are based on mistrusting and othering Muslims and Arabs." In the second email, Plaintiff said: "I think there is something deeply troubling with this whole situation. The unconscious biases and assumptions about my relationship with my colleagues who are women might be rooted in islamophobia and negative stereotypes about Arab-American and Muslim-American men." Good acknowledged: "As I said, and do actually believe, it's very possible that staff have unconscious/ conscious bias around working with a Arab Muslim man." Good apologized for sharing private information with Plaintiff's wife and never contacted him about the issue again.

55.     In that same exchange with Good, she said: "But the biggest issues here is, and I am going to have to sleep on it, generally my next step with an email like this is to send it to Margaret and HR. You've brought up some serious points around your perception around Danny [McGregor] and Zeke [Johnson], I want to take those seriously. But this will escalate the situation considerably."  Plaintiff wrote back: "I'm more than happy to file an official grievance with HR if that is your recommendation. Other colleagues have suggested that as well. I really want to get your feedback on the best way forward, and I'll follow your lead if you think an informal conversation with my colleagues who attended the DEI panel or a conversation with management would be productive."

56.     That same day, Plaintiff reached out to his Union shop stewards and asked to file a Union grievance against Huang. Plaintiff requested the Union's help to file a grievance against the retaliation he was subjected to after leading the petition effort. He expressed that the investigations were not only retaliatory in nature but also rooted in the prejudiced negative stereotype about Arab and/or Muslim men, and were defaming his character to other staff, including, but not limited to, his supervisor Lin.

57.     In their weekly Labor-Management Meeting (LMM) on May 22, 2018, Union shop stewards relayed these concerns and Plaintiff's intention to file a grievance against Huang.

58.     On May 23, 2018, Huang responded to the Union Shop steward's complaints on Plaintiff's behalf, refusing to discuss them and requesting instead a written grievance under the collective bargaining agreement. Her email to the Union shop stewards read: "I understand a member of the union wishes to bring a grievance regarding an issue with an Eteam member. The proper procedure is outlined in the contract, which I attach here. If we do not have a written grievance, we cannot respond formally to the grievance. Please advise whether a written report of the grievance will be provided to us."

59.     In an email on May 25, 2018, Plaintiff emailed Union representative Kevin Lynch with background information about his grievance. Plaintiff's email read in part "Folks from the management team indicated that they would like to "chat" with me during the retreat." Plaintiff added: "As we discussed, requesting an "informal" conversation would be great, but if they push for filing an official grievance then I'm happy to move in the direction as well."

60.     In response, later that day, Lynch emailed Plaintiff: "In some ways, the issues involving the interns are the easiest to handle. I already have management assurances that there will be no retaliation against any union member who signed the petition. If there is retaliation for any reason, including your exercise of free speech, we can file a grievance against the retaliation and win in the end." Lynch concludes his email: "More worrisome to me is the suggestion that you were insensitive on gender — strikes me that you should have an opportunity to discuss that with Margaret and Danny. We can file a grievance in which case I doubt there will be any discussion at the staff conference. We can recommend a discussion at the conference to clear the air — in which case serious discipline, such as suspension or termination, cannot be part of the agenda."

61.     On May 29, 2018, Lynch had a phone conversation with Huang. After talking to Lynch, Plaintiff emailed his shop stewards that same day to report that "Margaret [Huang] welcomed the idea of having a conversation with me to clear the air." Plaintiff agreed to have a discussion at the staff retreat.

62.     Huang did not approach Plaintiff during the retreat to initiate a conversation.

63.     In the night of May 30, 2018, during the retreat at an after-party at around midnight, Plaintiff was approached by a NY-based manager from Defendant AIUSA, whose identity is known to Defendant AIUSA. Plaintiff had never met the manager before. After going through

his wedding and honeymoon photos on his phone, she sexually propositioned him and his wife, asking to have sex with both of them. She told Plaintiff that she was in an open relationship with her boyfriend and that was an arrangement they reached after he cheated on her twice toward the beginning or their relationship. She told Plaintiff that she has an ongoing sexual relationship with a woman at Defendant AIUSA. She told Plaintiff that although she had never slept with a white person before, she would "make an exception for this wife." Plaintiff told the manager that his wife was not at the retreat. She said that she would contact Plaintiff and his wife to ask them out on a date next time she visited Washington, DC. Later, she propositioned Plaintiff again and offered him oral sex. Plaintiff declined. Plaintiff texted and called his wife that night and the next day and described exactly what happened. Plaintiff saw the NY-based manager twice the next day. They said goodbye and exchanged hugs before parting ways at the end of the retreat.

64.     On Monday June 5, 2018, immediately after coming back from the staff retreat, Plaintiff contacted his Union shop stewards to again request that the Union submit a written grievance because no meeting had taken place at the staff retreat. He had a draft ready for submission, and he scheduled a telephone conversation with one of his shop stewards the next day, June 6, 2018, to finalize and submit the written grievance alleging discrimination and retaliation.

65.     On June 6, 2018, the same day Plaintiff was scheduled to submit his Union grievance alleging discrimination and retaliation, Ianantuoni entered Plaintiff's office at work and asked him to follow him to another office. Plaintiff sat down with Ianantouni and another Defendant AIUSA human resources employee, Lloyd McIntosh. Ianantouni asked if Plaintiff "had sex with anyone during the retreat." Plaintiff responded no, he had not, and asked whether he was being accused of something. Plaintiff told Ianantuoni about his exchange with the NY-based manager at the retreat and said that was the only incident of sexual nature that took place. Ianantuoni handed Plaintiff a letter placing him on indefinite administrative leave and informing him: "In addition, you are prohibited from having any direct or indirect contact with any Defendant AIUSA employees. You are also prohibited from coming onto Defendant AIUSA property unless I (or my designee) notify you in advance that you are invited." Ianantuoni confiscated Plaintiff's laptop, gave him two minutes to exit the office, and instructed McIntosh to escort Plaintiff out.

66.     Plaintiff, alarmed by the fourth investigation, emailed Terry Rockefeller, a member of the Board of Directors of Defendant AIUSA, that evening. In his email, Plaintiff wrote to her:

"I've been having a very difficult time with management for a couple months now, and I was placed on administrative leave today, escorted out of the office, and cut off from email access.

Things were going really well for the first 6 months. I had some pushback against my work on Israel/Palestine, but nothing out of the ordinary. My probationary period review was excellent - I exceeded expectations! But on April 9th, I helped deliver a petition to Margaret [Huang] requesting that our interns get paid. She didn't like it at all, and reprimanded everyone who signed the petition. She told us that in the future, instead of using petitions as an organizing tool, we should request meetings with her because "petitions are hostile by nature". A number of staff members, including myself, felt like her response was so aggressive that our jobs were in jeopardy. And now, I've been under investigation and attacks by her and the management team ever since.

I was very concerned and told the management team that I feel like I'm being retaliated against because of my role with the intern petition. We had a couple meetings between management and the union to discuss this before the staff retreat, and I've decided to file an official grievance through the union (as my email pasted below shows) and management backed off. Today was the day I planned to file the grievance. Instead, as of today I'm being investigated and accused of misconduct at a party that happened during the staff retreat. The person leading the investigation is the interim HR director who was also involved in management's response to the intern petition (he is included in my grievance)."

67.    Plaintiff asked Rockefeller for an independent investigation:

"The reason why I'm contacting you is that I'm hoping you can play a role in ensuring this investigation is impartial and independent. After all the back and forth tension, I don't trust that our management team, led by Margaret, will conduct a fair investigation. Is there anyway you or the board can help ensure we have an independent investigation led by an external consultant rather than giving management the lead?"

68.     Plaintiff concluded the email:

> "I'm so disappointed at the way Margaret and the management team have
> overreacted to this paid internship issue - ordering us to refrain from signing
> petitions was the last thing I thought would happen to me at Amnesty
> International of all places. I'm also heartbroken by the way I've been treated in the
> last couple months - I truly believe that some racist and Islamophobic
> assumptions contributed to this escalation. This has been an extremely stressful
> situation for me and I can't believe that it has gotten to this point."

69.     Also on June 6, 2018, Plaintiff sent an email to Ianantuoni requesting more information
about the fourth investigation of his alleged conduct, since he still did not have information about
the nature or content of the allegations.

70.     On June 7, 2019 Ianantuoni emailed Plaintiff in reaction to his contact with Rockefeller,
prohibiting him from contacting any Defendant AIUSA board members:

> "In followup to my memo yesterday in which I instructed to you to refrain from
> contacting Defendant AIUSA employees, this is to inform you that you are also
> prohibited from contacting members of the Board or Defendant AIUSA members
> or volunteers during your administrative leave. Any questions you have should be
> directed to Margaret or me. Failure to act in accordance with these restrictions
> will be considered insubordinate. As I said yesterday, you will have the
> opportunity to provide your perspective as part of Defendant AIUSA's
> investigation."

71.     Also on June 7, 2018, Plaintiff emailed Huang and Ianantuoni requesting an independent
investigation, access to an attorney during the proceedings, and access to his work schedule to be
able to cancel meetings with high-level government officials so that his professional reputation
would not suffer from his sudden and unexplained absence. His email read in part:

> "1- Taking in consideration the grievance I'm filling through the union about the
> retaliation to my role with the interns' petition, I would like to request that any
> investigation into the most recent complaint be handled by an independent, third
> party. As the management team knows, I was planning to file an official
> grievance regarding the retaliation I've been dealing with since the petition
> delivery. As a matter of fact, I was finalizing my grievance text with my shop

steward yesterday. The management team, including yourself, are implicated in
my grievance. I know you mentioned yesterday that there is no investigation yet,
but in case things move in that direction would you be willing to recuse yourself
from leading the Investigation and getting an outside person/firm to lead it? I'm
very concerned about the fairness of an investigation if it's led by you or the
management team.

2- I need access to my work calendar and emails to cancel all the meetings I have.
Many of these meetings are high level meetings with the White House,
Department of State, DoD, and other government agencies. Can I contact my
supervisor or the IT department to gain access to the information without
tampering with the investigation?

3- when you contact me to conduct the investigation, I request that my union
representative be present. Do I also have the option to have my attorney be there
as well?"

72.     On June 8, 2018, Plaintiff contacted the National Labor Relations Board (NLRB) and on
June 11, 2018 Plaintiff signed and filed NLRB charge 05-CA-221952 against Defendant AIUSA
over its response to the interns' petition.

73.     On or around the week of June 11, 2018, the Union emailed Ianantuoni to request more
information about the investigation since the allegations and nature of the investigation had not
been disclosed by Defendant AIUSA.

74.     On June 12, 2018, for the first time in his life, Plaintiff start regularly seeing a
psychiatrist, and was prescribed medications after being diagnosed with severe anxiety.

75.     On June 13, 2018, Ianantuoni responded to Plaintiff via email with, in part:

"1. I will conduct the investigation, and it will be conducted thoroughly. When we
receive a grievance, we will respond accordingly. 2. Your appointments and calendar will
be reviewed and managed by your supervisor. 3. As is your right a shop steward/union
representative may be present when we speak. You do not have the right to bring an
attorney."

76.     On June 27, 2018, Plaintiff emailed Ianantuoni requesting more information about the
investigation since the allegations and nature of the investigation still had not been disclosed to
him or the Union by Defendant AIUSA.

77.     On July 5, 2018, Plaintiff saw a psychotherapist for the first time in his life and was diagnosed with severe anxiety again.

78.     On July 5, 2018, still without information about the allegations against him or the nature of the investigation, the Union requested information from Defendant AIUSA management: "Once again, the union requests that you share with us the nature of the allegations or complaints that led to Raed Jarrar being placed on paid leave." The email concludes with: "the union believes that member Jarrar has a right to know the general nature of the allegation or complaint prior to participating in the upcoming investigatory interview."

79.     On July 10, 2018, Plaintiff, by his counsel, sent an electronic letter to Huang demanding an immediate end to his suspension, and end to discrimination and retaliation against him, and removal of all documentation related to his suspension and false and defamatory charges against him.

80.     On July 11, 2018, Plaintiff, by his counsel, sent a request to Huang to preserve all electronically-stored information related to Plaintiff's case.

81.     On July 11, 2018, Plaintiff went to the Defendant AIUSA office for an investigation interview. Ianantuoni and Marcela Bringas von Rabenau (National Director, Street Canvassing) were both present. Plaintiff's Union representative, Kevin Lynch, participated in the meeting by telephone. After conferring with Lynch, Plaintiff audio-recorded this meeting. Ianantuoni told Plaintiff for the first time that the NY-based manager (who had propositioned him sexually at the staff retreat) had filed a complaint against him. He was asked to recounted all the details of the night in question at the staff retreat. Ianantuoni lied to Plaintiff about the nature of the allegations

> Plaintiff: "I assume that your questions are based on allegations that were made by [the manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?"
>
> Ianantuoni: "Yes, sir. That's why we're here today."

82.     Plaintiff was shocked to hear that there was a complaint filed by the NY-based manager who approached him and propositioned him. He was also alarmed by the allegations, especially Ianantuoni's manufactured allegations of false imprisonment.

83.     During the interview, Plaintiff described in detail what happened during the after-party and denied any inappropriate actions during the exchange with the NY-based manager.

84.     On July 20, 2018, after 45 days on administrative leave, Plaintiff participated in a telephone call with Ianantuoni and Plaintiff's supervisor, Lin, and Kevin Lynch from the Union. On that call, Defendant AIUSA informed Plaintiff that he was terminated effective immediately. Ianantuoni read a termination letter over the phone. He later emailed it to Plaintiff. The letter read:

> "Dear Raed: This confirms that your employment with Defendant AIUSA is being terminated, effective today, due to your inappropriate conduct toward a female coworker at the organizational retreat on May 30, 2018. Although you disputed your coworker's allegations, Defendant AIUSA found her description of events credible. She alleged that you made repeated unwanted sexual overtures toward her, including making comments about her body, suggesting sex that night, attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner. Defendant AIUSA takes such misconduct very seriously and, given the severity of the incident, has determined that discharge is appropriate. Information about benefits continuation will follow separately."

85.     This was the first time Plaintiff or the Union learned about the charges, and Plaintiff denied all of them. Defendant AIUSA never provided him with a precise statement of charges before the day of his termination, and Defendant AIUSA never gave him an opportunity to respond to the charges, provide a counter statement, offer any explanation, or submit evidence and additional witnesses.

86.     Plaintiff and Lynch were startled by the lack of due process. Defendant AIUSA policy manual suggests that a typical investigation would include "putting statements from each party in writing," which Plaintiff did not have the opportunity to do. It also describes an appeal process, stating that if either party was "dissatisfied with the results of the investigation," they may "discuss it directly with the Executive Director." Plaintiff was presented with the findings of the investigation only when his employment was terminated, and he was never given the opportunity to discuss it with Executive Director Huang.

87.     The section about harassment in Defendant AIUSA's policy manual is narrowly defined and mirrors definitions in US law: it requires Defendant AIUSA not only to prove that Plaintiff made unwanted advances but also to show that the alleged actions were a basis for employment

decisions or had the effect of unreasonably interfering with someone's work performance or creating a hostile work environment.

88.     During the 45 days of his suspension, Plaintiff was forced to miss numerous meetings and events without being able to cancel or reschedule, including meetings with the White House, Department of State, Department of Defense, Congress and meetings with other external partners. Plaintiff had to cancel local and international trips, decline media interviews with US and international media outlets, miss public speaking events, and disappear from his entire work community.

89.     On July 20, 2018, Plaintiff had a phone call with Lynch immediately after his employment was terminated. In that call, Plaintiff decided to fight his termination. He began to gather evidence to supply to the union.

90.     Plaintiff quickly reached out to the Normandy Farm Hotel and Conference Center where the events in question at the retreat took place. He contacted the hotel directly and by counsel to request copies of the surveillance footage during the relevant times and the relevant areas to disprove the allegations and charges against him.

91.     On or around July 21, 2018, Union representative Lynch told Plaintiff that he would request more information about the termination because the Union's contract with Defendant AIUSA states that "no employee covered by this agreement shall be disciplined or discharged except for just cause."

92.     On July 23, 2018, the Union requested all relevant paperwork in an email to Ianantuoni, reading: "...in preparation for filing a grievance over the termination of union member Raed Jarrar, the Union requests all documents, correspondence, meeting notes and reports which formed the basis for the decision to terminate Jarrar's employment on July 29, 2018."

93.     Also on July 23, 2018, a volunteer leader at Defendant AIUSA contacted Huang to inquire about what happened with the Plaintiff. Huang told him that "at the end it was a challenging situation but ultimately an easy decision to make." In that same conversation, Huang said that Mr. Jarrar was involved in "inappropriate conduct toward another employee." This statement is both false and defamatory.

94.     On July 24, Plaintiff attempted again to contact the Normandy Farm Hotel and Conference Center by both phone and email requesting copies of the surveillance tapes in the hotel. Plaintiff's email read, in part:

> "My attorney has been trying to get the contract information of the appropriate
> manager or legal council [sic] to deliver a request for preservation of
> electronically stored information.
>
> This is in reference to a legal dispute with my employer pertaining to events that
> took place at your hotel on Wednesday May 30 and Thursday May 31.
>
> I copied Ms. Lakea Stewart here from my attorney's office. She has contacted you
> multiple times last week to no avail, and we fear that the electronically stored
> information, including security camera recordings, might be lost if not preserved
> as soon as possible."

95.     On July 25, a representative from the Normandy Farm Hotel and Conference Center,
David S. Sherman, responded to the Plaintiff with an email:

> "...Just today, others in our organization have received about 25 calls and e-mails
> about this matter, but I am the right person to talk to.  My contact info is below.  I
> am happy to try and help."

96.     On a later date, the hotel informed Plaintiff by counsel that they no longer had footage
from the surveillance cameras from the relevant dates.

97.     On July 25, 2018, a volunteer leader with Defendant AIUSA had a phone call with
Defendant AIUSA's legal counsel. Notably, the counsel relayed to the volunteer leader that he
has advised Defendant AIUSA not to use language pertaining to "sexual harassment" or
"inappropriate conduct" in public communications pertaining to Plaintiff:

> "My conference call was with Ulana [Moroz], Daniel from the counsel's office,
> Bart [Ianantuoni] the new head of HR (he led the investigation), and Joanne
> Lin.… There was more, but all in this vein and most of the questions I asked I
> was told covered confidential material. When I raised issues of sexual harassment,
> Daniel insisted that they will not use that word in public discussions. When I told
> him Margaret [Huang] had used the phrase inappropriate conduct toward another
> employee, he said he would not use that phrase either."

98.     On July 26, 2018, Union representatives received a copy of the final 8-page investigation
memorandum sent by Ianantuoni to Huang. Upon examination of the document, the Union
reached the conclusion that Plaintiff had been fired unjustly. Union representative Lynch called

Plaintiff and told him over the phone, "This investigation is a bunch of bullshit and the union will fight it."

99.     The final eight-page investigation memorandum falsifies and misquotes Plaintiff's statements during the July 11, 2018, investigatory interview. The memorandum misrepresents what Plaintiff said about the events that took place on the first floor, and omits all his statements about the events that transpired while he was on the second floor. The memorandum misquotes the facts Plaintiff related for events (including the times and locations) and misrepresents statements made about other people involved. Ianantuoni used the falsified information to support the conclusion that the Plaintiff was guilty of misconduct, therefore, according to him, warranting termination. Plaintiff's audio recording of the entire July 11 investigatory interview exposes the discrepancies between what Plaintiff actually said and what Ianantuoni reported that he said.

100.    The Union reviewed the eight-page investigation memorandum, noted its discrepancies and falsifications, and concluded the termination was unjust.

101.    According to Defendant AIUSA's own findings, there were no eyewitnesses to the events in question.

102.    According to Defendant AIUSA's own findings, the only person who was in the room immediately before and after the events in question corroborated Plaintiff's narrative: "The situation made [the witness] uncomfortable because of their body language and their sitting close to one another. [The witness] knew that [NY-based manager] had a boyfriend, and if [the witness] had been [her] boyfriend and saw the situation, it would make the boyfriend uncomfortable," and "[the witness] was uncomfortable that she knew they were both in relationships and yet they were flirting."

103.    On July 30, 2018, the Union sent a message to Ianantuoni challenging the termination of Plaintiff and demanding his reinstatement:

> "Bart [Ianantuoni] ... Written on behalf of CWA Local 1180, this email
> constitutes the official filing of our grievance over the unjust termination of
> Defendant AIUSA's employment of our union member Raed Jarrar on July 20th,
> 2018. At that time, you informed Jarrar that his employment was being terminated
> immediately based on a Human Resources investigation of events that took place
> on the evening of May 30th, 2018. The Union asserts that there was not just cause

for firing Jarrar under the terms of our labor contract because management's conclusion that he engaged in "inappropriate conduct toward a female coworker" was not supported by the investigation or any other evidence. Therefore, the Union demands that Raed Jarrar be reinstated to his position at Defendant AIUSA with the return of lost wages, seniority and benefits, and all references to the events of May 30th be removed from his personnel files. Given the nature and scope of this case, we propose moving immediately to a Stage 2 Grievance. If you agree, please let us know when the Executive Director or Representative(s) can engage in a Stage 2 Grievance procedure with the Union."

104.    In or around August 2018, based on belief and information relayed to Plaintiff on a later date, members of the Executive Team at Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present." This statement is both false and defamatory.

105.    In or around August 2018, based on belief and information, Huang informed members of the Board of Directors of Defendant AIUSA that the incident leading to Plaintiff's termination "was not a he said/she said situation, and there was a witness(es) to some behavior." This statement is both false and defamatory.

106.    On August 8, 2018, the Union sent another email to Ianantuoni requesting eight additional relevant documents to prepare for a Step Two grievance hearing. This request included copies of the original complaint filed by the NY-based manager and copies of all transcripts of interviews conducted by Defendant AIUSA in the course of its fourth investigation.

107.    On August 29, 2019 the Union received the documents it had requested. After reviewing the documents, including the original complaint filed by the NY-based manger and transcripts of follow-up interviews, Plaintiff and the Union representative all observed that the charges against Plaintiff as stated in his termination letter did not reflect the allegations made by the NY-based manager.

108.    According to Defendant AIUSA's charges against Plaintiff as stated in his termination letter, "she alleged that you made repeated unwanted sexual overtures toward her," including "attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner."

109.    Plaintiff categorically denies all of Defendant AIUSA's allegations against him, including those of the NY-based manager, but the actual allegations of the NY-based manager, in her own words, do match what Defendant AIUSA claims of her allegations.

110.    The NY-based manager's statement does not mention or describe "repeated unwanted sexual overtures towards her." Her allegation is that when Plaintiff went to kiss her, "she did not stop him but was visually uncomfortable." Then, in a quote from a follow-up interview that was conspicuously omitted in Defendant AIUSA's final investigation memorandum, she confirms that "I am bothered that I didn't shut it down. I honestly didn't know how to react. I was nervously giggling - he probably took that as if I was flattered." She also admits she called Plaintiff "attractive" and "gorgeous."

111.    In her own words, the NY-based manager does not mention or describe Plaintiff "attempting to kiss her after she asked [him] not to do so." Her allegation is that she said "please don't kiss me," so Plaintiff complied and "turned his head away from her." Then in a quote from her follow-up interview that was conspicuously omitted from Defendant AIUSA's final investigation memorandum, she said: "I kissed him back because I didn't want to but I have no idea why I did."

112.    Nowhere in the entire investigation report, interviews or complaint does the NY-based manager mention the word "intimidating" or any words to that effect.

113.    The allegations of the NY-based manager would neither constitute a quid pro quo sexual harassment nor a hostile work environment under Defendant AIUSA's employee manual, which states (emphasis added):

> "Sexual harassment includes any **unwelcome sexual conduct** on the job, including sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature **when**:
>
> * Submission to, acceptance of, or rejection of such advances, requests or conduct is made either explicitly or implicitly a term of employment or as a basis for employment decisions.
>
> * Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance and/or creating an intimidating, hostile, humiliating or offensive work environment."

114.    After reviewing the additional documentation, including the transcript and investigation questions from the July 11, 2018, investigatory interview, Plaintiff and Union representatives concluded that Ianantuoni intentionally manufactured the question suggesting false imprisonment. He read all other questions before and after directly from the investigation form.

115.    On August 31, 2018, Union representative Lynch emailed Ianantuoni with a formal request for "three witnesses to be present at some point in our meeting."

116.    On September 5, 2018, Plaintiff attended the Step Two grievance meeting. Plaintiff recorded the entire meeting. Huang refused to allow Plaintiff or the Union representative Lynch to interview any witnesses or ask any questions. She also instructed Ianantuoni to not answer any questions. Although Section C of Article 10 of the collective bargaining agreement states: "Any necessary and relevant witness shall be excused from work for the time required to provide his/her statement at the meeting," During the meeting Huang told Plaintiff that "we're not going to provide people to respond to questions in the stage two process."

117.    During this meeting, Plaintiff and Lynch presented documents to Defendant AIUSA officials showing in detail how the allegations, based on the investigation interviews, transcripts and statements, did not match those in the termination letter.

118.    As the meeting was coming to a close, Lynch commented on the lack of participation by Defendant AIUSA's representatives, "...I don't think it was a fair process and I'm astounded by it frankly."

119.    On September 7, 2018, Plaintiff, by counsel, sent a letter to the Defendant AIUSA legal team outlining the discrepancies between the allegations in the termination letter and the actual findings.

120.    On September 7, 2018, Plaintiff, by counsel, sent a cease and desist letter to the Defendant AIUSA legal team. The letter states: "The purpose of this letter is to notify you that Margaret Huang has been defaming my client, Raed Jarrar, which has caused damage to his reputation." The 4-page letter concludes with "This is false and constitutes defamation per se. By this letter I am demanding that you counsel your client to cease and desist from defaming my client."

121.    On September 14, 2018, Plaintiff filed a charge with the EEOC. The grievance and the EEOC charge addressed two different wrongs. The grievance invoked the "just cause" clause of the collective bargaining agreement because Plaintiff was not guilty of any dischargeable

offense. In contrast, the EEOC charge alleged that Defendant AIUSA's actions were discriminatory and retaliatory in violation of Title VII.

122.     In or around October 27, a volunteer with Defendant AIUSA approached Njambi Good to inquire about the lack of due process in Plaintiff's case. The volunteer asked why Defendant AIUSA management denied Plaintiff's request for an independent, third-party investigation. Good told the volunteer that based on information she had reviewed, "even if an independent firm had come in and done the review, they would've reached the same conclusion."

123.     On October 2, 2018, the Union sent its notice to arbitration to Huang, stating: "Please accept this email as a notice that the Union plans to arbitrate the grievance for Mr. Raed Jarrar. Please confirm your acknowledgement of this email."

124.     On October 24, 2018, after learning about Plaintiff's EEOC charge, Defendant AIUSA caused the Union to withdraw his grievance from arbitration. At issue was Defendant AIUSA's reliance on Article 4(C) of the collective bargaining agreement to withdraw the grievance that had been filed. Article 4(C) reads:

> "If at any time an employee files a claim of discrimination with any state or federal agency or court, the employee thereby waives the right to bring or maintain a grievance or arbitration over the subject matter of that claim, and any grievance or arbitration proceedings concerning that claim which are occurring or which may already have taken place shall be terminated and obligation imposed upon the employer shall be rendered null and void."

125.     On January 16, 2019, the NLRB hearing took place. The NLRB complaint alleged that Defendant AIUSA violated the National Labor Relations Act (NLRA) in several respects. At the hearing, Plaintiff testified and presented audio evidence. Although the circumstances of his suspension and termination were not an issue in the case, and although Defendant AIUSA has been notified multiple times by Plaintiff that claims in the termination letter are false according to Defendant AIUSA's own investigation documents, Defendant AIUSA sought to impeach him by introducing his termination letter. The effort failed but the termination letter was entered into the hearing record.

126.     On March 18, 2019, the NLRB publicly posted the Administrative Law Judge's (ALJ) findings of fact and conclusions of law on its website. The ALJ found that Defendant AIUSA violated the NLRA as alleged.

127.    On March 20, 2019, Hassan Ali from the media outlet Bloomberg Law contacted Plaintiff to notify him the reporter was investigating the NLRB ruling and that he had published a story on Bloomberg.com. Ali also requested to discuss the matter further with Plaintiff. Plaintiff established contact and various communications ensued.

128.    Plaintiff limited his exchange with Ali to issues pertaining to the petition, interns' payment, and co-defendants' hypocrisy in not practicing what it preaches.

129.    On March 22, 2019, after reaching out to Defendant AIUSA, Ali emailed Plaintiff:

> "the org's stance is this was all totally about sexual harassment; I did say to them that I expect they'll be able to detail the allegations/incident a bit more, given that they've investigated and reached a conclusion. They said they'd check with legal regarding how much they can/should say, and got back a bit later to say they'd have full responses for me on Monday (I sent a long, detailed list of questions/fact-checking issues)."

130.    On March 22, 2019, Hassan Ali sent Plaintiff a message via Direct Message on Twitter to inform him the following:

> "I've just spoken with some folks at Amnesty, and am about to send them a list of fact-checking questions/issues. I'll tell you a bit more when we chat but generally, they were adamant that the real issue here is that you were dismissed for a valid, thoroughly-investigated harassment claim, and that you're not trying to get back at the org via various complaints."

131.    On March 23, 2019, Amanda Simon wrote to Ali via email, sharing with him Plaintiff's termination letter:

> "Thanks, Hassan.
>
> I'm attaching the termination letter here to provide off the record context. We're comfortable sharing this as it was entered into the record during the NRLB hearing.
>
> Thanks again,
>
> Mandy"

132.    On March 26, 2019, Ali sent Plaintiff the following message within an email, including information from Defendant AIUSA which is both false and defamatory:

"Hey Raed, It's looking like I'll probably turn in a draft today, that'll run early tomorrow morning (possibly early evening, but unlikely). This, a portion of Amnesty's answers to me, summarizes their general response (which also suggests you're engaging in a "smear campaign"): 'In keeping with Amnesty International USA personnel policies, we maintain to the greatest degree possible an employee's confidentiality on matters related to their employment. Unfortunately, though, Mr. Jarrar has chosen to engage in public discussions with media and staff about the circumstances related to his termination. Accordingly, we felt it was necessary to respond to these false and harmful allegations. To be absolutely clear: Mr. Jarrar was terminated following a complaint of sexual harassment by a coworker, and a thorough investigation found her version of events credible. Any allegation that this is part of a conspiracy or setup is deeply offensive and wholly untrue. We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim. We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them.'"

133.    In addition, on or around March 26, 2019, Simon and Wyskida, on behalf of Defendant AIUSA, provided Bloomberg Law with this statement, which is both false and defamatory:

"We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim.  We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them."

134.    By sharing this information with Bloomberg Law, Defendant AIUSA published their false and defamatory statement without privilege to a third party.

135.    On March 28, 2019, in a letter to the EEOC, Defendant AIUSA wrote the following, which is both false and defamatory:

"We are advised that [Plaintiff] has recently undertaken a series of communications to the media and Defendant AIUSA employees apparently seeking, inter alia, to intimidate the victim who filed a complaint against him and

> to retaliate against her for exercising her rights under both Title VII and
> Defendant AIUSA's anti-harassment policy to be free of sexual harassment."

136.   Plaintiff categorically denies naming the NY-based manager publicly (or in communications with Defendant AIUSA employees) or attempting to intimidate or silence her.

137.   By sharing this information with the EEOC, Defendant AIUSA published false and defamatory statement without privilege to a third party.

138.   On April 4, 2019, Bloomberg Law published a story that includes the exact language from the termination letter. Bloomberg wrongfully attributed the allegations in Plaintiff's termination letter to the NY-based manager, instead of rightfully citing Ianantuoni's version:

> "Then came the sexual harassment complaint, arising from an incident between Jarrar and a manager from Defendant AIUSA's New York office during an organizational retreat.
>
> The manager said Jarrar made "repeated unwanted sexual overtures toward her, including making comments about her body, suggesting sex that night, attempting to kiss her" and "pressing [his] body against her in an intimidating manner," according to the termination letter. Jarrar said he didn't know the woman before the retreat.
>
> Simon said Defendant AIUSA has "a clear and well-established policy" of conducting prompt investigations and taking actions when a credible complaint is made to human resources. The organization said in its termination letter that it "takes such misconduct very seriously" and fired Jarrar for that complaint alone, "given the severity of the incident.""

139.   After the publication of the article, Plaintiff's final-round interview for another job was abruptly cancelled, although he was a strong candidate for the position.

140.   Also after the publication of the article, during an interview for another job, the hiring panel placed a copy of the article on the table and asked Plaintiff to explain. Although he was a strong candidate, Plaintiff did not get that job.

141.   On April 5, 2019, a country specialist in Defendant AIUSA's Middle East Coordination Group, who is a former colleague of the Plaintiff, started an email chain on an internal list where she posted the Bloomberg article. Another country specialist from the same coordination group replied with concerns about how Plaintiff was treated: "I was also concerned about what seemed

to be 'selective leaking' of information which portrayed the charges against him as incredibly serious and shameful and undisputable." She added: "I felt this 'selective leaking' was a violation of personnel confidentiality and prejudicial." A third country specialist from the same group replied: "I am really, really uncomfortable with the disclosure of the details of [Plaintiff]'s termination, with any attempts to discuss his case in this public forum, and with any discussion that invites speculation about what we cannot know." She added: "I was sorry to see him go, because he was good at his job and because I personally felt more respected and treated as a colleague by him than I have felt very often in Defendant AIUSA in the last decade or two." Another country specialist replied to the thread: "Raed was hustled out of his office the very day he was going to file an official grievance and this fact was known to many people. Timing was very "strange" to put it mildly. He was then put on leave and not told about the particulars of the accusation against him and did not have an opportunity to have a fair hearing before he was terminated. I believe it is our responsibility to insist that people in the organization are treated fairly and provided with due process. The charge made against Raed is very serious and has the potential to negatively impact his professional life in the future. The charge was made public by senior management --- I had been under the impression that details about reasons for termination were considered confidential personnel matters and not to be disclosed?."

142.    In response, Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent the following email to an internal listserv, which is both false and defamatory:

> "Defendant AIUSA terminated Raed Jarrar as a result of a credible sexual harassment complaint. Defendant AIUSA is strongly committed to taking sexual harassment claims seriously. In this situation, the harasser was terminated. Defendant AIUSA is legally bound to defend this action or risk that the harasser will be reinstated to our workforce. Our legal representation remains the same and litigation costs are being managed."

143.    The back and forth continued with Farrar repeating Defendant AIUSA's false narrative. Another Defendant AIUSA affiliate on the list replied back: "That 'Raed was hustled out of his office the very day he was going to file an official grievance and this fact was known to many people,' is unconscionable, and none of the Board responses have disputed this fact. Then the allegations of sexual harassment were aired, which does not seem right, and the Board seems to be saying the people accused of sexual harassment don't have a right to a fair hearing."

144.    On April 15, 2019, Farrar emailed the listserv again, with statements which are both false and defamatory:

> "First, this situation involves a personnel issue, which Defendant AIUSA would not normally address.  However, because the employee continues to allege that he was discharged in retaliation for protected activity, although he voluntarily withdrew that charge, Defendant AIUSA had to present a copy of his termination letter to the NLRB Administrative Law Judge to respond to the employee's false narrative.  Then, when he gave the name of the sexual harassment victim to the press and the press contacted her, Defendant AIUSA immediately sought to protect the victim from being further victimized.  While I understand that there are supporters of the former employee, I urge you all to consider the fact that that former employee provided the press with the name of the victim and encouraged them to get in touch with her, which they did. To my mind, that's unconscionable behavior but I expect we all have different standards."

145.    By sharing this information on the listserv, Defendant AIUSA published a false and defamatory statement without privilege to a third party.

146.    After Defendant AIUSA published false and defamatory statements about Plaintiff, he had to seek additional medical attention. He was prescribed heart medication for palpitations caused by extreme anxiety.

147.    Based on belief and information, the week after this exchange on the listserv, Defendant AIUSA investigated the same Middle East and North Africa coordination group members who spoke up on behalf of the Plaintiff. They were all investigated for supposed "misconduct" and "sexual harassment" that took place at an AIUSA event 6 weeks before the listserv exchange. Members of the group, mostly women, were subjected to elaborate misconduct investigations and gag orders that lasted for almost two months.

148.    Based on belief and information, at the conclusion of the investigations, members of the groups were sanctioned and reprimanded.

## COUNT I

## DISCRIMINATION

149.   Plaintiff realleges and incorporates all the factual allegations above.

150.   By its actions and statements, including but not limited to, the investigation, suspension, and subsequent false and defamatory statements about him, and retaliation for his having filed an EEOC charge against Defendant AIUSA and his having opposed discriminatory practices by Defendant AIUSA and causing the Union to withdraw his grievance and thus deprive Plaintiff of his right to protest the absence of just cause in his termination and to arbitrate his grievance, Defendant AIUSA discriminated against the Plaintiff on the bases of race, gender, religion, and national origin, and retaliated against him, in violation of Sections 2-1402.11(a)(1) (discrimination and retaliation because of race, gender, national origin, and religion), 2-1402.61(a) and (b) (discrimination and retaliation for opposing unlawful practices) and 2-1402.62 (aiding and abetting unlawful acts).

## COUNT II

## RETALIATION

151.   Plaintiff realleges and incorporates all the factual allegations above.

152.   By its actions and statements, including but not limited to, the inquiries/investigations, suspension, termination, and subsequent false and defamatory statements about him, and retaliation for his having filed an EEOC charge against Defendant AIUSA and his having opposed discriminatory practices by Defendant AIUSA, and collaborating with the Union to deprive Plaintiff of his right to protest and arbitrate his grievance, Defendant AIUSA retaliated against Plaintiff in violation of DC Code § 32–1311.

## COUNT III

## DEFAMATION

153.   Plaintiff realleges and incorporates all the factual allegations above.

154.   The false accusations perpetuated by Defendant AIUSA and the publication and republication of the false statements, including the termination letter, proximately caused general and special damages to Plaintiff. Defendants knew, anticipated, foresaw, and intended that the termination letter would be read by persons throughout the United States and the world and would damage the reputation of the Plaintiff. This action, as well as the false rumors, have adversely affected Plaintiff's professional reputation, professional relationships, personal relationships, family, career prospects, and caused psychological and emotional trauma and suffering.

155.   By publishing and causing to be published false and defamatory information about Plaintiff, Defendant AIUSA defamed him under the common law of the District of Columbia and of the states in which Defendant AIUSA published defamatory statements.

156.   Defendant AIUSA's statements were actionable as a matter of law irrespective of special harm and/or its publication caused Plaintiff special harm; Plaintiff was actually treated and billed by a medical doctor for physical anxiety, hypertension, heart palpitations, and emotional distress directly and proximately caused by Defendant AIUSA's publication of false statements about him.

157.   Plaintiff incorporates by reference the allegations contained in paragraphs 1-149 as if fully set forth herein: that Huang, Simon, Farrar, and **Wyskida** at all times alleged herein were acting within the scope of their employment or contract with broad authority to further Defendant AIUSA's mission. That assuming those duties within the scope of their employment, Huang, Simon, Farrar, and **Wyskida** used (a) organizational resources and (b) facilities to make false and defamatory statements concerning Plaintiff to third parties, affiliated and unaffiliated with the organization, including but not limited to, false and defamatory statements concerning Plaintiff to the media outlet Bloomberg Law. The agents of Defendant AIUSA who made false and defamatory statements in writing and/or orally included the following statements:

   a.   On April 9, 2018 Defendant AIUSA told Plaintiff's supervisor Lin that Daphne Eviatar had complained about negative gender dynamics with Plaintiff. At a later

date, Defendant AIUSA admitted no complaint was ever lodged by Eviatar. On or around May 2018, Plaintiff's supervisor Lin was told by Defendant AIUSA that two women colleagues complained about the Plaintiff's negative gender dynamics at a DEI hiring panel. At a later date, Defendant AIUSA admitted that there were no women who filed the complaint. Defendant AIUSA's false and defamatory statements falsely portrayed plaintiff as a misogynist man with negative gender dynamics with his female colleagues at work.

b. On July 11, 2018, while at the investigation interview, the Plaintiff asked, in front of everyone present in the meeting: "I assume that your questions are based on allegations that were made by [the manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?" Ianantuoni falsely responded, in front of Kevin Lynch and Marcela Bringas von Rabenau responded, "Yes, sir. That's why we're here today."

c. On July 20, 2018, Defendant AIUSA issued a termination letter to Plaintiff where Defendant AIUSA claimed that a NY-based manager "alleged that you made repeated unwanted sexual overtures toward her," including "attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner." Later, after receiving all the investigation documents through the Union, it became evident that none of these allegations were made by the NY-based manager. Rather, these were false claims by Defendant AIUSA.

d. On July 23, 2018, a volunteer leader at Defendant AIUSA contacted Huang to inquire about what happened with the Plaintiff. Huang told him that "at the end it was a challenging situation but ultimately an easy decision to make." In that same conversation, Huang said that Mr. Jarrar was involved in "inappropriate conduct toward another employee." This information is false.

e. In or around August 2018, based on belief and information relayed to Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present." This information is false even according to Defendant AIUSA's own investigation findings.

f.  In or around August 2018, based on belief and information, Huang informed
    Defendant AIUSA board members that the incident leading to Plaintiff's
    termination "was not a he said/she said situation, and there was a witness(es) to
    some behavior." This information is false even according to Defendant AIUSA's
    own investigation findings.

g.  On January 16, 2019, the NLRB hearing took place. The NLRB complaint alleged
    that Defendant AIUSA violated the National Labor Relations Act (NLRA) in
    several respects. At the hearing, Plaintiff testified and presented audio evidence.
    Although the circumstances of his suspension and termination were not an issue
    in the case, and although Defendant AIUSA has been notified multiple times by
    Plaintiff that claims in the termination letter are false according to Defendant
    AIUSA's own investigation documents, Defendant AIUSA sought to impeach
    him by introducing his termination letter. The effort failed but the termination
    letter was entered into the hearing record.

h.  On March 23, 2019, Amanda Simon wrote to Ali of Bloomberg Law via email,
    sharing with him Plaintiff's termination letter. Sharing these false statements with
    the media is defamatory.

    "Thanks, Hassan.

    I'm attaching the termination letter here to provide off the record context. We're
    comfortable sharing this as it was entered into the record during the NRLB
    hearing.

    Thanks again,

    Mandy"

i.  On March 26, 2019, Ali sent Plaintiff the following message within an email. The
    false statements shared with Ali are defamatory:

    "Hey Raed, It's looking like I'll probably turn in a draft today, that'll run early
    tomorrow morning (possibly early evening, but unlikely). This, a portion of
    Amnesty's answers to me, summarizes their general response (which also
    suggests you're engaging in a "smear campaign"): 'In keeping with Amnesty
    International USA personnel policies, we maintain to the greatest degree possible
    an employee's confidentiality on matters related to their employment.

Unfortunately, though, Mr. Jarrar has chosen to engage in public discussions with media and staff about the circumstances related to his termination. Accordingly, we felt it was necessary to respond to these false and harmful allegations. To be absolutely clear: Mr. Jarrar was terminated following a complaint of sexual harassment by a coworker, and a thorough investigation found her version of events credible. Any allegation that this is part of a conspiracy or setup is deeply offensive and wholly untrue. We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim. We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them.'"

j.  On or around March 26, 2019, Simon and Wyskida, on behalf of Defendant AIUSA, provided Bloomberg Law with these false and defamatory statements: "We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim.  We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them."

k.  On March 28, 2019, in a letter to the EEOC, Defendant AIUSA shared false and defamatory statements: "We are advised that [Plaintiff] has recently undertaken a series of communications to the media and Defendant AIUSA employees apparently seeking, inter alia, to intimidate the victim who filed a complaint against him and to retaliate against her for exercising her rights under both Title VII and Defendant AIUSA's anti-harassment policy to be free of sexual harassment."

l.  Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent the following false and defamatory statements to an Defendant AIUSA listserv: "Defendant AIUSA terminated Raed Jarrar as a result of a credible sexual harassment complaint. Defendant AIUSA is strongly committed to taking sexual harassment claims seriously. In this situation, the harasser was terminated. Defendant AIUSA is legally bound to defend this action or risk that the harasser

will be reinstated to our workforce. Our legal representation remains the same and litigation costs are being managed."

   m.  On April 15, 2019, Farrar emailed the listserv again with additional false and defamatory statements:

"First, this situation involves a personnel issue, which Defendant AIUSA would not normally address.  However, because the employee continues to allege that he was discharged in retaliation for protected activity, although he voluntarily withdrew that charge, Defendant AIUSA had to present a copy of his termination letter to the NLRB Administrative Law Judge to respond to the employee's false narrative.  Then, when he gave the name of the sexual harassment victim to the press and the press contacted her, Defendant AIUSA immediately sought to protect the victim from being further victimized.  While I understand that there are supporters of the former employee, I urge you all to consider the fact that that former employee provided the press with the name of the victim and encouraged them to get in touch with her, which they did. To my mind, that's unconscionable behavior but I expect we all have different standards."

## COUNT IV

### INVASION OF PRIVACY
### FALSE LIGHT

158.   Plaintiff realleges and incorporates all the factual allegations above.

159.   By publishing and causing to be published false and defamatory information about Plaintiff, Defendant AIUSA placed him in a false and defamatory light under the common law of the District of Columbia and of the states in which Defendant AIUSA published defamatory statements.

160.   That Defendant AIUSA caused excessive publicity about a false statement, representation or imputation understood to be of and concerning the Plaintiff, and which placed Plaintiff in a false light within and outside of the organizational community to detached third parties in a manner that would be offensive to a reasonable person. That Defendant AIUSA reported to

Bloomberg Law the following false statements concerning Plaintiff's unjust termination with the intent that the story receives mass publicity:

    a.   On April 9, 2018 Defendant AIUSA told Plaintiff's supervisor Lin that Daphne Eviatar had complained about negative gender dynamics with Plaintiff. At a later date, Defendant AIUSA admitted no complaint was ever lodged by Eviatar. On or around May 2018, Plaintiff's supervisor Lin was told by Defendant AIUSA that two women colleagues complained about the Plaintiff's negative gender dynamics at a DEI hiring panel. At a later date, Defendant AIUSA admitted that there were no women who filed the complaint. Defendant AIUSA's false and defamatory statements falsely portrayed plaintiff as a misogynist man with negative gender dynamics with his female colleagues at work.

    b.   On July 11, 2018, while at the investigation interview, the Plaintiff asked, in front of everyone present in the meeting: "I assume that your questions are based on allegations that were made by [the manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?" Ianantuoni falsely responded, in front of Kevin Lynch and Marcela Bringas von Rabenau responded, "Yes, sir. That's why we're here today."

    c.   On July 20, 2018, Defendant AIUSA issued a termination letter to plaintiff where Defendant AIUSA claimed that a NY-based manager "alleged that you made repeated unwanted sexual overtures toward her," including "attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner." Later, after receiving all the investigation documents through the Union, it became evident that none of these allegations were made by the NY-based manager. Rather, these were false claims by Defendant AIUSA.

    d.   On July 23, 2018, a volunteer leader at Defendant AIUSA contacted Huang to inquire about what happened with the Plaintiff. Huang told him that "at the end it was a challenging situation but ultimately an easy decision to make." In that same conversation, Huang said that Mr. Jarrar was involved in "inappropriate conduct toward another employee." This information is false.

e.  In or around August 2018, based on belief and information relayed to Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present." This information is false even according to Defendant AIUSA's own investigation findings.

f.  In or around August 2018, based on belief and information, Huang informed Defendant AIUSA board members that the incident leading to Plaintiff's termination "was not a he said/she said situation, and there was a witness(es) to some behavior." This information is false even according to Defendant AIUSA's own investigation findings.

g.  In or around August 2018, based on belief and information relayed to Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present."

h.  On January 16, 2019, the NLRB hearing took place. The NLRB complaint alleged that Defendant AIUSA violated the National Labor Relations Act (NLRA) in several respects. At the hearing, Plaintiff testified and presented audio evidence. Although the circumstances of his suspension and termination were not an issue in the case, and although Defendant AIUSA has been notified multiple times by Plaintiff that claims in the termination letter are false according to Defendant AIUSA's own investigation documents, Defendant AIUSA sought to impeach him by introducing his termination letter. The effort failed but the termination letter was entered into the hearing record. Introducing these false statements into the public record placed Plaintiff in false light.

i.  On March 23, 2019, Amanda Simon wrote to Ali via email, sharing with him Plaintiff's termination letter. Sharing these false statements with the media is defamatory.

"Thanks, Hassan.

I'm attaching the termination letter here to provide off the record context. We're comfortable sharing this as it was entered into the record during the NRLB hearing.

Thanks again,

Mandy"

j.  On March 26, 2019, Ali sent Plaintiff the following message within an email. The
    false statements shared with Ali are defamatory:

    "Hey Raed, It's looking like I'll probably turn in a draft today, that'll run early
    tomorrow morning (possibly early evening, but unlikely). This, a portion of
    Amnesty's answers to me, summarizes their general response (which also
    suggests you're engaging in a "smear campaign"): 'In keeping with Amnesty
    International USA personnel policies, we maintain to the greatest degree possible
    an employee's confidentiality on matters related to their employment.
    Unfortunately, though, Mr. Jarrar has chosen to engage in public discussions with
    media and staff about the circumstances related to his termination. Accordingly,
    we felt it was necessary to respond to these false and harmful allegations. To be
    absolutely clear: Mr. Jarrar was terminated following a complaint of sexual
    harassment by a coworker, and a thorough investigation found her version of
    events credible. Any allegation that this is part of a conspiracy or setup is deeply
    offensive and wholly untrue. We received a complaint of inappropriate sexual
    conduct and were required by law and our policy to conduct an investigation. We
    then took appropriate action. We stand with the victim. We reject the effort to
    shift the blame by naming that person publicly in an attempt to intimidate and
    silence them.'"

k.  On or around March 26, 2019, Simon and Wyskida, on behalf of Defendant
    AIUSA, provided Bloomberg Law with these false and defamatory statements:
    "We received a complaint of inappropriate sexual conduct and were required by
    law and our policy to conduct an investigation. We then took appropriate action.
    We stand with the victim.  We reject the effort to shift the blame by naming that
    person publicly in an attempt to intimidate and silence them."

l.  On March 28, 2019, in a letter to the EEOC, Defendant AIUSA shared false and
    defamatory statements: "We are advised that [Plaintiff] has recently undertaken a
    series of communications to the media and Defendant AIUSA employees
    apparently seeking, inter alia, to intimidate the victim who filed a complaint
    against him and to retaliate against her for exercising her rights under both Title

VII and Defendant AIUSA's anti-harassment policy to be free of sexual harassment."

m. Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent the following false and defamatory statements to a Defendant AIUSA listserv: "Defendant AIUSA terminated Raed Jarrar as a result of a credible sexual harassment complaint. Defendant AIUSA is strongly committed to taking sexual harassment claims seriously. In this situation, the harasser was terminated. Defendant AIUSA is legally bound to defend this action or risk that the harasser will be reinstated to our workforce. Our legal representation remains the same and litigation costs are being managed."

n. On April 15, 2019, Farrar emailed the listserv again with additional false and defamatory statements:

"First, this situation involves a personnel issue, which Defendant AIUSA would not normally address. However, because the employee continues to allege that he was discharged in retaliation for protected activity, although he voluntarily withdrew that charge, Defendant AIUSA had to present a copy of his termination letter to the NLRB Administrative Law Judge to respond to the employee's false narrative. Then, when he gave the name of the sexual harassment victim to the press and the press contacted her, Defendant AIUSA immediately sought to protect the victim from being further victimized. While I understand that there are supporters of the former employee, I urge you all to consider the fact that that former employee provided the press with the name of the victim and encouraged them to get in touch with her, which they did. To my mind, that's unconscionable behavior but I expect we all have different standards."

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

161. Plaintiff incorporate by reference the allegations contained in paragraphs 1-148 as if fully set forth herein: That for all of the reasons noted above, Defendant AIUSA engaged in conduct that was so outrageous in character, and so extreme in degree to lie to Plaintiff about the

allegations against him by leading him to believe that there were rape allegations against him and at a later date claim there were false imprisonment allegations against him. That it was further extreme and outrageous to knowingly and falsely, intentionally and/or recklessly report to third persons that the Plaintiff engaged in misconduct of any sort.

162.     That as a direct and proximate cause of Defendant AIUSA's conduct Plaintiff required medical treatment from healthcare professionals. That as a further direct and proximate cause of Defendant AIUSA's conduct, Plaintiff suffered humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain and suffering, and such other non-economic damages proven at trial.

## PRAYER FOR RELIEF

163.     The violations of statutory law and the torts alleged above entitle Plaintiff to reinstatement, back pay, front pay, direct, consequential and punitive damages, including attorneys' fees, against Defendant AIUSA, including interest, according to evidence at trial; and such other and further relief that Plaintiff may be entitled to under law. Plaintiff seeks compensatory damages in an amount to be determined at trial and in excess of $1,000,000 U.S. Dollars.

## JURY DEMAND

164.     Plaintiff demands trial by jury on all claims and issues so triable.

_____               ___July 16, 2019___
Raed Jarrar, pro se                            (dated)

41

**EXHIBIT 2**

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH

### INFORMATION SHEET

Raed Jarrar

Case Number: 2019 CA 004664 B

vs

Amnesty International of the USA   ☐ One of the defendants is being sued
in their official capacity.

| Name: (Please Print) RAED JARRAR | Relationship to Lawsuit |
|---|---|
| Firm Name: | ☐ Attorney for Plaintiff |
|  | ☒ Self (Pro Se) |
| Telephone No.:          Six digit Unified Bar No.:<br>(202) 558-0346 | ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury   ☒ 6 Person Jury          ☐ 12 Person Jury

Demand: $1,000,000                    Other: Reinstatement

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.: _____   Judge: _____   Calendar #: _____

Case No.: _____   Judge: _____   Calendar#: _____

---

NATURE OF SUIT:     (Check One Box Only)

**A. CONTRACTS**                           **COLLECTION CASES**

| | |
|---|---|
| ☐ 01 Breach of Contract | ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied |
| ☐ 02 Breach of Warranty | ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied |
| ☐ 06 Negotiable Instrument | ☐ 27 Insurance/Subrogation                     ☐ 26 Insurance/Subrogation |
| ☐ 07 Personal Property | Over $25,000 Pltf. Grants Consent         Over $25,000 Consent Denied |
| ☒ 13 Employment Discrimination | ☐ 07 Insurance/Subrogation                     ☐ 34 Insurance/Subrogation |
| ☐ 15 Special Education Fees | Under $25,000 Pltf. Grants Consent       Under $25,000 Consent Denied |
| | ☐ 28 Motion to Confirm Arbitration |
| | Award (Collection Cases Only) |

**B. PROPERTY TORTS**

| | | |
|---|---|---|
| ☐ 01 Automobile | ☐ 03 Destruction of Private Property | ☐ 05 Trespass |
| ☐ 02 Conversion | ☐ 04 Property Damage | |
| ☐ 07 Shoplifting, D.C. Code § 27-102 (a) | | |

**C. PERSONAL TORTS**

| | | |
|---|---|---|
| ☐ 01 Abuse of Process | ☒ 10 Invasion of Privacy | ☐ 17 Personal Injury- (Not Automobile, |
| ☐ 02 Alienation of Affection | ☒ 11 Libel and Slander | Not Malpractice) |
| ☐ 03 Assault and Battery | ☐ 12 Malicious Interference | ☐ 18 Wrongful Death (Not Malpractice) |
| ☐ 04 Automobile- Personal Injury | ☐ 13 Malicious Prosecution | ☐ 19 Wrongful Eviction |
| ☐ 05 Deceit (Misrepresentation) | ☐ 14 Malpractice Legal | ☐ 20 Friendly Suit |
| ☐ 06 False Accusation | ☐ 15 Malpractice Medical (Including Wrongful Death) | ☐ 21 Asbestos |
| ☐ 07 False Arrest | ☐ 16 Negligence- (Not Automobile, | ☐ 22 Toxic/Mass Torts |
| ☐ 08 Fraud | Not Malpractice) | ☐ 23 Tobacco |
| | | ☐ 24 Lead Paint |

SEE REVERSE SIDE AND CHECK HERE        IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

- [ ] 01 Accounting
- [ ] 02 Att. Before Judgment
- [ ] 05 Ejectment
- [ ] 09 Special Writ/Warrants
  (DC Code § 11-941)
- [ ] 10 Traffic Adjudication
- [ ] 11 Writ of Replevin
- [ ] 12 Enforce Mechanics Lien
- [ ] 16 Declaratory Judgment

- [ ] 17 Merit Personnel Act (OEA)
  (D.C. Code Title 1, Chapter 6)
- [ ] 18 Product Liability

- [ ] 24 Application to Confirm, Modify,
  Vacate Arbitration Award (DC Code § 16-4401)
- [ ] 29 Merit Personnel Act (OHR)
- [ ] 31 Housing Code Regulations
- [ ] 32 Qui Tam
- [ ] 33 Whistleblower

**II.**

- [ ] 03 Change of Name
- [ ] 06 Foreign Judgment/Domestic
- [ ] 08 Foreign Judgment/International
- [ ] 13 Correction of Birth Certificate
- [ ] 14 Correction of Marriage
  Certificate
- [ ] 26 Petition for Civil Asset Forfeiture (Vehicle)
- [ ] 27 Petition for Civil Asset Forfeiture (Currency)
- [ ] 28 Petition for Civil Asset Forfeiture (Other)

- [ ] 15 Libel of Information
- [ ] 19 Enter Administrative Order as
  Judgment [ D.C. Code §
  2-1802.03 (h) or 32-151 9 (a)]
- [ ] 20 Master Meter (D.C. Code §
  42-3301, et seq.)

- [ ] 21 Petition for Subpoena
  [Rule 28-1 (b)]
- [ ] 22 Release Mechanics Lien
- [ ] 23 Rule 27(a)(1)
  (Perpetuate Testimony)
- [ ] 24 Petition for Structured Settlement
- [ ] 25 Petition for Liquidation

**D. REAL PROPERTY**

- [ ] 09 Real Property-Real Estate
- [ ] 12 Specific Performance
- [ ] 04 Condemnation (Eminent Domain)
- [ ] 10 Mortgage Foreclosure/Judicial Sale
- [ ] 11 Petition for Civil Asset Forfeiture (RP)

- [ ] 08 Quiet Title
- [ ] 25 Liens: Tax / Water Consent Granted
- [ ] 30 Liens: Tax / Water Consent Denied
- [ ] 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature
PLLH, P. SO

_July 16, 2019_
Date

CV-496/ June 2015

**EXHIBIT 3**

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

RAED JARRAR
    Vs.                                              C.A. No.        2019 CA 004664 B
AMNESTY INTERNATIONAL OF THE USA INC

## INITIAL ORDER AND ADDENDUM

Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby **ORDERED** as follows:

(1) Effective this date, this case has assigned to the individual calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption. On filing any motion or paper related thereto, one copy (for the judge) must be delivered to the Clerk along with the original.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of serving on each defendant: copies of the summons, the complaint, and this Initial Order and Addendum.  As to any defendant for whom such proof of service has not been filed, the Complaint will be dismissed without prejudice for want of prosecution unless the time for serving the defendant has been extended as provided in Super. Ct. Civ. R. 4(m).

(3) Within 21 days of service as described above, except as otherwise noted in Super. Ct. Civ. R. 12, each defendant must respond to the complaint by filing an answer or other responsive pleading. As to the defendant who has failed to respond, a default and judgment will be entered unless the time to respond has been extended as provided in Super. Ct. Civ. R. 55(a).

(4) At the time and place noted below, all counsel and unrepresented parties shall appear before the assigned judge at an initial scheduling and settlement conference to discuss the possibilities of settlement and to establish a schedule for the completion of all proceedings, including, normally, either mediation, case evaluation, or arbitration. Counsel shall discuss with their clients **prior** to the conference whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this Conference.**

(5) Upon advice that the date noted below is inconvenient for any party or counsel, the Quality Review Branch (202) 879-1750 may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. Request must be made not less than seven business days before the scheduling conference date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order.  Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

                                        Chief Judge Robert E. Morin

Case Assigned to:  Judge HIRAM E PUIG-LUGO
Date:   July 17, 2019
Initial Conference: 9:30 am, Friday, October 18, 2019
Location:   Courtroom 317
            500 Indiana Avenue N.W.
            WASHINGTON, DC 20001

                                                                    CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

In accordance with the Medical Malpractice Proceedings Act of 2006, D.C. Code § 16-2801, et seq. (2007 Winter Supp.), "[a]fter an action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ("ISSC"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC." D.C. Code § 16-2821.

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC. D.C. Code § 16-2825 Two separate Early Mediation Forms are available.  Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Both forms also are available in the Multi-Door Dispute Resolution Office, Suite 2900, 410 E Street, N.W.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  *Pro se* Plaintiffs who elect not to eFile may file by hand in the Multi-Door Dispute Resolution Office.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation. D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one. D.C. Code § 16-2823(b).

The following persons are required by statute to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.  D.C. Code § 16-2824.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation. D.C. Code§ 16-2826.  Any Plaintiff who is *pro se* may elect to file the report by hand with the Civil Actions Branch. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief   Judge   Robert   E.   Morin

**EXHIBIT 4**

Superior Court of the District of Columbia
**CIVIL DIVISION**
Civil Actions Branch
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

Raed Jarrar

_____
Plaintiff

vs.

Amnesty International of the USA Inc
_____
Defendant

Case Number    **2019 CA 004664 B**

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Raed Jarrar, Pro Se
Name of Plaintiff's Attorney

3355 16th  St NW, Apt 401
Address
Washington, DC 20010

(202) 558-0346
Telephone
如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Dể có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시오    የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

Clerk of the Court

By _____
Deputy Clerk

Date _____

**07/19/2019**

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**EXHIBIT 5**

## IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

Civil Division

---

| | | |
|---|---|---|
| **RAED JARRAR** | ) | |
| 3355 16th St NW, Apt 401 | ) | |
| Washington, DC 20010 | ) | |
| | ) | **No. 2019 CA 004664 B** |
| Plaintiff, | ) | |
| | ) | JURY TRIAL DEMANDED |
| v. | ) | |
| | ) | |
| **AMNESTY INTERNATIONAL** | ) | |
| **OF THE USA INC** | ) | |
| 600 Pennsylvania Avenue SE, Ste 500 | ) | |
| Washington, DC 20003 | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

1.     Plaintiff Raed Jarrar ("Plaintiff") brings this complaint against Amnesty International of the USA Inc ("AIUSA") for acts in violation of DC Code Sections 2-1402.11(a)(1) (discrimination and retaliation because of race, gender, national origin, and religion); 2-1402.61(a) and (b) (discrimination and retaliation for opposing unlawful practices) and 2-1402.62 (aiding and abetting unlawful acts); and DC Code Section 32-1311 (discrimination and retaliation for advocating against wage theft and wage and hour violations); defamation under the common law of the District of Columbia; invasion of privacy – false light under the common law of the District of Columbia; and intentional infliction of emotional distress under the common law of the District of Columbia.

2.     The Plaintiff brings a private cause of action under DC Code Section 2–1403.16 (discrimination, retaliation and aiding and abetting) and DC Code Section 32–1308(a)(1)(A).

3.     The Superior Court of the District of Columbia has jurisdiction over these claims in accordance with DC Code Section 11–921.

## VENUE

4.     Venue is proper in this Court because all or a substantial portion of the events that gave rise to Plaintiff's claims took place in the District of Columbia, including the acts of discrimination and retaliation and publication or republication of defamatory falsehoods, the acts placing the Plaintiff in a false and defamatory light, intentional infliction of emotional distress and the damage to Plaintiff's reputation.

## PARTIES

5.     Plaintiff was employed by Defendant AIUSA in 2017 and 2018 in Washington, DC. Plaintiff lives in Washington, DC.  He is a male whose race is Arab, whose national origin is Palestinian and Iraqi, and whose religion is Muslim.

6.     Defendant AIUSA is a not-for-profit organization incorporated in the State of New York, with its main places of business in New York, NY; Washington, DC; Chicago, IL; Atlanta, GA; and Oakland, CA. Since its foundation in 1966, the United States branch of the organization has worked to free prisoners of conscience, oppose torture, and fight other human rights violations around the world. Defendant AIUSA has over 350,000 members.

## FACTS

7.     BDI Coaching and Consulting is a NY-based company that provides human resources services to AIUSA. At all material times with respect to the conduct of its agents, it was acting as an agent of Defendant AIUSA.

8.     Fenton Communications is a public relations firm, which maintains offices in Washington, DC, San Francisco, and New York City. At all material times with respect to the conduct of its agents, it was acting as an agent of Defendant AIUSA.

9.     At all material times, Becky Farrar was the Chair of Defendant AIUSA's Board of Directors and an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

10.    At all material times, Margaret Huang was the Executive Director of Defendant AIUSA, and an agent of Defendant AIUSA with respect to her conduct alleged in this complaint. Huang works in Washington, DC, and is the highest-ranking employee within Defendant AIUSA. Huang manages Defendant AIUSA, along with an executive team comprising unit and group managers.

11.    At all material times, Amanda Simon was the Interim Deputy Executive Director, Public Affairs of Defendant AIUSA, and was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

12.    At all material times, Joanne Lin was National Advocacy Director of Defendant AIUSA and Plaintiff's immediate supervisor. She was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

13.    At all material times, Njambi Good was the Deputy Executive Director of Defendant AIUSA. She was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

14.    At all material times, Zeke Johnson was the Senior Director of Programs at Defendant AIUSA. He was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

15.    At all material times, Danny McGregor was the Chief Development Officer at Defendant AIUSA. He was an agent of Defendant AIUSA with respect to her conduct alleged in this complaint.

16.    At all material times, Bart Ianantuoni worked for BDI Coaching and Consulting, and held the position of Chief People Officer, HR Consultant and Coach. Ianantuoni was the Defendant AIUSA's interim head of human resources and was an agent of Defendant AIUSA with respect to his conduct alleged in this complaint.

17.    At all material times, Ben Wyskida was the CEO of Fenton Communications and was an agent of Defendant AIUSA with respect to his conduct alleged in this complaint.

18.    Plaintiff started his position as the Middle East and North Africa Advocacy Director at Defendant AIUSA on September 11, 2017. While working in this position, Plaintiff's responsibilities included meeting with US government officials to advocate on issues involving the Middle East and North Africa, speaking to the media to convey reports and analyses, and authoring blogs and op-eds. His salary

was approximately $98,000 per year. Out of over 100 AIUSA employees at the time of his employment, Plaintiff was the only Arab-American and Muslim-American male working for Defendant AIUSA.

19.    As more fully described below, Plaintiff led an internal petition challenging Defendant AIUSA's practice of employing unpaid interns, protesting the discriminatory aspects of the practice of employing unpaid interns, and calling on Defendant AIUSA to pay its interns. Following Plaintiff's advocacy, Defendant AIUSA defamed, placed in a false light, discriminated against, retaliated against, and intentionally inflicted emotional distress on Plaintiff. Immediately after organizing the petition, Defendant AIUSA suddenly began to scrutinize Plaintiff's work. Defendant AIUSA then investigated him four times in the course of two months. Defendant AIUSA placed Plaintiff on indefinite administrative leave, then terminated him on July 20, 2018. Plaintiff did nothing to merit Defendant AIUSA's actions and was not guilty of any offence for which Defendant AIUSA investigated, placed on administrative leave, and terminated him. Defendant AIUSA, among others, further discriminated and retaliated against Plaintiff by causing the withdrawal of a grievance protesting his termination from arbitration after he filed a charge with the Equal Employment Opportunity Commission ("EEOC").

20.    Plaintiff was a member of Communications Workers of America, Local 1180 ("the Union") since he began his employment with Defendant AIUSA. On March 16, 2018, he joined the Union's negotiating team that was bargaining for a successor collective bargaining agreement.

21.    For his probationary employee evaluation review on April 9, 2018, Plaintiff was rated by his supervisor Lin with "exceeds expectations" and received a promotion and raise. He had an exemplary performance record. Members of Defendant AIUSA's senior management team and organizational volunteers also reported to him that Defendant AIUSA considered his performance to be outstanding. Throughout his employment until that time, there was not a single investigation into his conduct by management.

22.    In her review, Lin stated: "[I]n his seven months on the job, Raed [Jarrar] has fulfilled and exceeded all expectations on responsibilities 1-6. On his own initiative, he took on responsibilities 7-8, which weren't being properly attended to by other staff. In recognition of these new duties, I amended his job description and increased his salary accordingly."

23.    One of Plaintiff's colleagues thanked him for his work by stating, "You have been a smart, creative, and respectful colleague, and I am grateful to you for

4

providing the best MENA AD experience I've had in at least 15 years - probably 20."

24.     In February 2018, a group of interns working in the Washington, DC office of AIUSA approached Plaintiff with complaints that they were not being compensated for their work. Plaintiff had several conversations with these interns and exercised his rights protected under Chapter § 32–13 of the DC Code by leading the effort to get the interns paid for their work. Plaintiff advised the interns to submit a petition requesting compensation for their work. Plaintiff assisted the interns with drafting the petition and by providing feedback and editing.

25.     On April 2, 2018, Defendant AIUSA's government relations unit held its weekly meeting. Approximately ten staff, including Plaintiff, participated in the meeting. During this meeting, Huang shared the results of an annual employee satisfaction survey. After the presentation, she invited questions and Plaintiff raised the complaint of the interns not being paid for their work. Plaintiff suggested that Defendant AIUSA consider paying its interns and articulated the applicable principles and moral grounds justifying a change in the unpaid internship policy. Huang said that she would be meeting with the executive team that weekend to discuss the issue.

26.     On that same day, Plaintiff advised the interns to finalize and deliver the petition immediately, and he helped gather signatures from paid staff at the Washington, DC office of Defendant AIUSA in support of the petition.

27.     On April 3, 2018, the interns delivered the petition to Huang.

28.     Among other things, the petition addressed equal opportunity employment based on the fact that offering only unpaid internships leads to a lack of racial diversity in the intern pool. It stated (emphasis added): "**Providing compensation for internships would demonstrate true commitment to making Amnesty an equal opportunity employer and creating a diverse workplace**. Amnesty International's commitment to human rights should be proven from within first. It is a basic human right to be able to seek employment and the lack of monetary compensation in this position restricts the ability to carry out that right. **Without pay, AIUSA's internships are more available to students of higher socioeconomic status, which serves to limit racial and socioeconomic diversity**. In order to create a more diverse and varied work environment it is imperative that Amnesty help include those people who cannot afford to live with a fair and standardized pay."

29.     On April 9, 2018, Huang and Ianantuoni met with the DC office interns. Huang informed them that in response to their petition Defendant AIUSA would

5

start paying interns for the fall 2018 term. That change, however, had no bearing on the interns in attendance.

30.     On the same day, April 9, 2018, Huang and Ianantuoni met with staff who signed the petition, rebuked them, and threatened them with reprisal for their participation in concerted organizing. In response to Huang, during that meeting, a number of staff members mentioned Plaintiff's role in leading the petition effort.

31.     Huang informed the employees that Defendant AIUSA would be implementing a paid internship program. However, rather than having 40-50 interns at any given time, Defendant AIUSA would hire only three paid interns for the entire organization. The Washington, DC office would end up with one intern instead of the usual average of fifteen. Her announcement evoked complaints from employees who relied on interns for their programs. Huang said she was "disappointed" because she had an open-door policy and would have expected employees to discuss their concerns with her or request a meeting with the executive team before resorting to a petition. She characterized the employees' action as "aggressive" and "litigious." Ianantuoni weighed in several times during the meeting to support Huang, including by making a comment defending the unpaid internship programs by saying that he himself had once been an unpaid intern.

32.     During the meeting, Huang made statements such as the following: "Next time, you shouldn't sign petitions. Rather, you should request a meeting with me." She further stated that sending petitions was "hostile by nature." She informed staff that the petition was "adversarial" because she believed it contained threats of litigation. She told staff that she felt "blind-sided" that no one told her that there was a petition in the making. She asserted that she thought that they were all friends and that it made her sad that nobody warned her about this petition. Regarding the reduced number of interns, Huang stated: "I know that you all rely on interns to do your work and now we will end up with one intern at the DC office. So, I do not know how you will manage to do your work, but that's what happened."

33.     During this meeting, Plaintiff spoke up and indicated that he thought the meeting had started on the wrong note. He stated that the way the decision was made to cut interns to only one at the DC office appeared "punitive." He pointed out that three interns for the entire organization appeared to be an artificially low number and that there were other financial options for funding more interns. He explained that the petition did not include any threats of litigation. He observed that Defendant AIUSA frequently utilizes the tactic of signing and sending petitions. He suggested that they restart the meeting on a better note.

34.     After work hours on April 9, 2018, unionized staff met in person at a nearby restaurant. Most staff at the meeting expressed fear of reprisal from management. Plaintiff called into the meeting by phone.

35.     On or about April 9, 2018, Huang met with Plaintiff's supervisor, Lin. Lin informed Plaintiff that Huang complained to her about him "spearheading" the petition. In addition, Huang raised concerns about Plaintiff's involvement with the union negotiations team and its effect on his workload. In March 2018, the Union had sent a correspondence to Defendant AIUSA requesting that Plaintiff's involvement in the Union not be discussed with his supervisor. The Union sent a request to Defendant AIUSA back on March 19, 2018 that read: "List of negotiation's team list is attached. *Raed Jarrar from our negotiations team would prefer the e-team does not contact his manager regarding lowering workload during negotiations at this time."

36.     Plaintiff viewed the meeting as retaliatory and discussed his concerns with his Union shop steward, Emily Walsh.

37.     On April 11, 2018, Union shop steward Emily Walsh sent an email summarizing what happened on April 9, 2018. The email read: "This meeting has been described as hostile, to the extent that staff in the room felt fearful of retaliation just for this gesture of support," and that "Staff responded as much as possible, given the temperature of the room and fear of retaliation [...] With great surprise at this sudden decision." Walsh's email concludes with reassuring staff: "I want to make it clear that anyone who feels retaliated against, intimidated, etc. because of this is encouraged to talk to a Shop Steward. The union is behind us 100%."

38.     On April 12, 2018, Walsh sent another email to all unionized staff reassuring them that: "If you signed on to the letter, please know that you are completely protected against retaliation."

39.     On April 13, 2018, Plaintiff emailed his Union shop stewards to follow up on his concerns pertaining to Huang's meeting with his supervisor on April 9, 2018. Plaintiff's email read: "I'm a bit concerned about a meeting that took place between Margaret [Huang] and my boss, Joanne [Lin], this week." Plaintiff explained that Huang "seems to believe that I 'spearheaded' the petition work" where "some staff (according to her) felt pressured to sign." Plaintiff also mentioned a second concern: "the second point that Margaret [Huang] raised with Joanne [Lin] was that I am on the negotiations team and I might need some time to work on this during my office hours. As you might remember (and see your email to management below), I have expressed strong preference against sharing this with Joanne [Lin]. I'm not sure why Margaret [Huang] delivered this news

7

to Joanne [Lin] against my preferences, and I hope it was not in retaliation to my role with the interns' petition."

40.    The Union was concerned about retaliation for Plaintiff's role with the interns' petition and requested an explanation. Defendant AIUSA informed the Union that Huang would reach out directly to Plaintiff and arrange for a meeting between the two of them to discuss his concerns. The meeting did not take place until May 9, 2018.

41.    During the week of April 9, 2018, Defendant AIUSA informed Plaintiff that he was no longer allowed to hire a pre-approved fellow to work on human rights issues in Egypt. Before the intern petition, Plaintiff, along with his colleague Sarah Cleveland, had helped secure a large donation toward his work on Egypt. He had conversations with the Development and Finance departments at Defendant AIUSA about ways to spend the money, and one of the ways suggested by both was to hire a fellow. This is something that his predecessor has done with similar restricted funds. This donor requested, as a condition, to speak with Plaintiff before wiring the money to the organization. After a detailed presentation about Plaintiff's work on Egypt, the donor was satisfied and wired the money. After the delivery of the petition to Defendant AIUSA, however, Huang informed Plaintiff's supervisor Lin that Plaintiff was not permitted to use the money to hire a fellow. Huang referenced the interns' petition and subsequent cuts in interns as the reason behind her decision.

42.    Also during the week of April 9, 2018, immediately after the delivery of the petition to Defendant AIUSA, Lin informed Plaintiff that she had received emails and calls from Zeke Johnson, a manager from another AIUSA unit, requesting an urgent meeting with her to discuss concerns about Plaintiff. The concerns, as portrayed by Johnson, were about an alleged complaint by Daphne Eviatar, an AIUSA employee based in New York City, regarding "negative gender dynamics" with Plaintiff.

43.    A few days later, Lin called Plaintiff into her office. She told Plaintiff that Johnson contacted her about the issue again and that it seemed more serious. Lin told Plaintiff that in her subsequent conversation with Johnson, he continued to raise vague concerns about Plaintiff's "negative gender dynamics". Lin instructed Plaintiff to reach out directly to Eviatar to clear up the situation.

44.    On or around April 16, 2018, after being instructed to do so by Lin, Plaintiff called Eviatar to inquire about any possible concerns she might have pertaining to negative gender dynamics, and to rectify the situation as quickly as possible. Eviatar told Plaintiff that she had not complained to anyone about gender dynamic issues. She assured him that there was nothing wrong with their interpersonal

relationship, and the two agreed to set up weekly meetings to improve coordinate their work. Aware that it was possible Eviatar did not feel comfortable telling him directly about any concerns she might have, Plaintiff suggested to Lin that she meet with Eviatar and Johnson alone to discuss the issue. Lin met with them at a later date in New York and confirmed Eviatar had not complained about Plaintiff or had any "negative gender dynamic" concerns.

45.     At a later date, Plaintiff obtained a copy of an internal email exchange between Eviatar, Johnson and Good that took place in early April 2018. The exchange exposed how Defendant AIUSA editorialized seemingly simple feedback from Eviatar, and manufactured the entire "negative gender dynamics" angle before relying it to Lin. The conversation started with simple feedback about communication issues between Eviatar and the Government Relations ("GR") team, including Plaintiff. On April 4, 2018, Johnson wrote back with a generic answer: "GR seems really disorganized from what I can see and I think often they don't have names and contacts, which is a problem. They're all pretty new and Joanne [Lin] was focused on immigration before coming here. I think we can get it all sorted." Right after the petition delivery, Johnson claimed that the issue had "escalated," then Johnson and Good editorialized Eviatar's feedback and manufactured the "negative gender dynamic" allegations on their own, without any input from Eviatar. At no point did Eviatar mention or imply any issues of gender dynamics. In an email from Johnson to Good on April 6, 2018, he says: "it makes me concerned about gender dynamics and [Diversity, Equity and Inclusion] DEI," and Good replies: "I too am concerned both that Raed [Jarrar] is not abiding by the division of labor and also from a DEI lens may be taking up more space than appropriate."

46.     On April 16, 2018, Lin informed Plaintiff that he was under a second investigation for possibly influencing the work of the International Secretariat, a sister organization of Defendant AIUSA where his fiancée at the time, Alli McCracken, worked. Defendant AIUSA accused Plaintiff of influencing McCracken's work and leaking information to the International Secretariat. Defendant AIUSA questioned Plaintiff, and Huang instructed other staff members to send her their notes of any interactions with Plaintiff that pertained to the investigation. Defendant AIUSA instructed Plaintiff to provide copies of all his emails and other interactions surrounding the project to Njambi Good, the Deputy Executive Director at Defendant AIUSA who reported directly to Executive Director Huang and was tasked by Huang to lead the inquiry. In the presence of his supervisor Lin, Good questioned Plaintiff. Plaintiff denied any allegations of influencing his fiancée's work.

47.    On April 24, 2018, Plaintiff participated in a Diversity, Equity and Inclusion ("DEI") hiring panel at the Washington, DC office of Defendant AIUSA. That next day, Plaintiff went on leave for two weeks for his wedding and honeymoon.

48.    Upon his return, on or about May 8, 2018, Lin informed Plaintiff that he was under a third investigation because, according to Defendant AIUSA, "a couple of women colleagues" had complained about Plaintiff's "negative gender dynamics" during the DEI hiring panel. Plaintiff was shocked to hear that he was under yet another investigation. Lin told Plaintiff that Good wanted to meet to discuss the new investigation.

49.    On or about May 8, 2018, Plaintiff realized that there was a pattern of repeated false and defamatory allegations and investigations against him. Plaintiff decided to record further conversations with Defendant AIUSA and to document its retaliatory, discriminatory, and other unlawful statements and actions.

50.    On May 9, 2018, Plaintiff finally met with Huang to discuss the internship petition and his concerns about retaliation. This meeting was requested by the Union in mid-April, 2018. Plaintiff recorded most of that conversation on his telephone. During this conversation, Plaintiff expressed concerns that he had been scrutinized and targeted with a series of investigations after his role with the petition. Huang said that no one would be fired or otherwise retaliated against for supporting the petition, but she repeated many of the statements she made in the April 9, 2018 meeting.

51.    On May 10, 2018, in an example of how Plaintiff's work was suddenly scrutinized, Amanda Simon, Interim Deputy Executive Director, stepped in personally to stop a public letter on Gaza that Plaintiff was leading with other organizations. It was highly unusual for the Interim Deputy Executive Director to micromanage employees, and Simon has never done so before this point.

52.    On May 13, 2018, Good emailed Plaintiff's wife Alli Jarrar [née McCracken]. Although Plaintiff had complied with all instructions and denied influencing his wife's work, Good wrote to Ms. Jarrar, shared private information about the second investigation of Plaintiff, and brought up the same allegations.

53.    In that same exchange on May 13, 2018, Good confirmed to Plaintiff that Huang was behind the investigation: "if you feel that I am part of the miscommunication, please feel free to go to Margaret [Huang] directly."

54.    On May 15, 2018, Plaintiff had a video conference meeting with Good. On information and belief, Good was in Atlanta, GA at that time. Plaintiff recorded the conversation. Good informed Plaintiff that she led the inquiry and that she had watched a video of the DEI panel, which had been recorded. She noted that

Plaintiff was between six and seven minutes late to the panel. She said that she had contacted female colleagues to investigate their version of events pertaining to the alleged negative gender dynamics issues. Plaintiff and Good engaged in a 15-minute conversation, during which Plaintiff asked Good about the possibility of obtaining permission to reveal the identity of the two women who allegedly made the gender-related complaint against Plaintiff that initiated the third investigation. Eventually, Good admitted to Plaintiff that it was Danny McGregor, a top-level AIUSA manager who was not a part of the panel. Good told Plaintiff that McGregor contended, after watching a recorded video of the panel, that Plaintiff created a negative gender dynamic during the panel.

55.    Good then stated that she had watched the tape and that she was "on the fence" about the alleged negative gender dynamic issue.

56.    Plaintiff expressed concern that this was the second time in a month where management had falsely claimed women had complained about him. Plaintiff was shocked to discover that Defendant AIUSA had lied about the complaint as having come from female colleagues and that no women had actually filed complaints against him.

57.    Plaintiff also expressed concern that it was the second time in a month where he found out a complaint had actually come from a white male manager instead of female colleagues. Plaintiff perceived that Defendant AIUSA was applying a prejudiced stereotype of Muslim men or men of Arab descent to him.

58.    Shortly after the meeting, still on May 15, 2018, Plaintiff met with Lin in her office. Lin expressed surprise that McGregor was the one behind the complaint because she was told that the complaint was made by two of Plaintiff's female co-workers.

59.    Later on May 15, 2018, in another example of how Plaintiff's work was suddenly scrutinized, Huang emailed and reprimanded a Country Specialist on Plaintiff's team because of her work on the Gaza letter. It was highly unusual for the Executive Director to contact Country Specialists directly, and Huang has never done so before this point.

60.    Also on May 15, 2018, in another example of how Plaintiff's work was suddenly scrutinized, Huang requested that Lin email her a copy of Plaintiff's workplan. Lin emailed Huang at midnight with the workplan. It was highly unusual for the Executive Director to request workplans for employees, and Huang has never done so before this point.

61.    On May 17, 2018, Plaintiff exchanged several emails with Good. Even though Good had admitted to Plaintiff two days earlier that no women had filed

complaints against him and that she was "on the fence" regarding the negative gender dynamic allegations, Good told Plaintiff: "[I] noted the same things when I watched the [DEI hiring panel] and when I heard about tensions with you and Daphne [Eviatar]." When Plaintiff learned that Good was aware of the false allegations made against him regarding negative gender dynamics with Eviatar, he came to realize that this investigation was another example of the broader pattern of retaliation against him.

62.     That same day, Plaintiff expressed serious concerns in two separate emails to Good regarding the second and third investigations: "The assumption that I would control my wife, speak on her behalf, or pressure her to do things for my political agenda might be rooted in Islamophobia and negative stereotypes about Arab-American and Muslim-American men. The assumption that I have a hidden agenda that would push me to leak information to the [International Secretariat] about our work or hide information from my colleagues is in the core of Islamophobic theories that are based on mistrusting and othering Muslims and Arabs." In the second email, Plaintiff said: "I think there is something deeply troubling with this whole situation. The unconscious biases and assumptions about my relationship with my colleagues who are women might be rooted in islamophobia and negative stereotypes about Arab-American and Muslim-American men." Good acknowledged: "As I said, and do actually believe, it's very possible that staff have unconscious/ conscious bias around working with a [sic] Arab Muslim man." Good apologized for sharing private information with Plaintiff's wife and never contacted him about the issue again.

63.     In that same exchange with Good, she said: "But the biggest issues here is, and I am going to have to sleep on it, generally my next step with an email like this is to send it to Margaret [Huang] and HR. You've brought up some serious points around your perception around Danny [McGregor] and Zeke [Johnson], I want to take those seriously. But this will escalate the situation considerably." Plaintiff wrote back: "I'm more than happy to file an official grievance with HR if that is your recommendation. Other colleagues have suggested that as well. I really want to get your feedback on the best way forward, and I'll follow your lead if you think an informal conversation with my colleagues who attended the DEI panel or a conversation with management would be productive."

64.     That same day, alarmed by the repeated false investigations into him coming from AIUSA, Plaintiff reached out to his Union shop stewards and asked to file a Union grievance against Huang and other AIUSA agents. Plaintiff requested the Union's help to file a grievance against the retaliation he was subjected to after leading the petition effort. He expressed that the investigations were not only

retaliatory in nature but also rooted in the prejudiced negative stereotype about Arab-American and/or Muslim-American men, and were defaming his character to other staff, including, but not limited to, his supervisor Lin.

65.     In their weekly Labor-Management Meeting on May 22, 2018, Union shop stewards relayed these concerns and Plaintiff's intention to file a grievance against Huang and other agents of Defendant.

66.     On May 23, 2018, Huang responded to the Union Shop stewards' complaints on Plaintiff's behalf. She emailed them and copied Ianantouni and McGregor. Huang refused to discuss Plaintiff's grievance with them and requested instead a written grievance under the collective bargaining agreement. Her email to the Union shop stewards read: "I understand a member of the union wishes to bring a grievance regarding an issue with an Eteam member. The proper procedure is outlined in the contract, which I attach here. If we do not have a written grievance, we cannot respond formally to the grievance. Please advise whether a written report of the grievance will be provided to us." Plaintiff was concerned about what appeared to be another escalation. He contacted the Union Shop Steward Gerry Carolina Rivadeneira and asked: "Is this a major escalation or it's usual business? I'd love to hear your thoughts on how to handle this, and what's the best tone to keep moving forward." Rivadeneira answered: "to be honest, there are many messed up incidents that happen in this org but no one flags them because everyone is scared of management. I think this is an escalation from usual business but that's because usual business has never included these [sic] type of grievances. The grievances I've encountered in the short period of time I've been at the union has revolved around job termination, performance improvement plans and salary adjustments. I think anything is automatically escalated when Margaret [Huang] is involved, but i don't think you're wrong. There's just very weak precedent of union members bringing grievances on these [sic] type of injustices."

67.     On or around May 25, 2018, Plaintiff saw Good in the Washington DC office, and she suggested that a conversation between him and the management team should take place during the staff retreat that was coming up. On May 25, 2018, Plaintiff emailed Union representative Kevin Lynch with background information about his grievance. Plaintiff's email read in part "Folks from the management team indicated that they would like to "chat" with me during the retreat." Plaintiff added: "As we discussed, requesting an "informal" conversation would be great, but if they push for filing an official grievance then I'm happy to move in the direction as well."

68.     In response, later that day, Lynch responded to Plaintiff: "In some ways, the issues involving the interns are the easiest to handle. I already have management

assurances that there will be no retaliation against any union member who signed the petition. If there is retaliation for any reason, including your exercise of free speech, we can file a grievance against the retaliation and win in the end." Lynch concludes his email: "More worrisome to me is the suggestion that you were insensitive on gender — strikes me that you should have an opportunity to discuss that with Margaret [Huang] and Danny [McGregor]. We can file a grievance in which case I doubt there will be any discussion at the staff conference. We can recommend a discussion at the conference to clear the air — in which case serious discipline, such as indefinite administrative leave or termination, cannot be part of the agenda."

69.     On May 29, 2018, Lynch had a phone conversation with Huang. After debriefing with Lynch, Plaintiff emailed his shop stewards that same day to report that "Margaret [Huang] welcomed the idea of having a conversation with me to clear the air." Plaintiff agreed to have a discussion at the staff retreat.

70.     Huang and other AIUSA agents did not approach Plaintiff during the staff retreat to initiate a conversation.

71.     In the night of May 30, 2018, during the retreat at an after-party at around midnight, Plaintiff was approached by a NY-based manager from AIUSA, whose identity is known to Defendant AIUSA. Plaintiff had never met the manager before. After going through his wedding and honeymoon photos on his phone, she sexually propositioned him and his wife, asking to have sex with both of them. She told Plaintiff that she was in an open relationship with her boyfriend, and that was an arrangement they had reached after he cheated on her twice in the beginning of their relationship. She told Plaintiff that she has an ongoing sexual relationship with a woman on staff at AIUSA. She told Plaintiff that although she had never slept with a white person before, she would "make an exception for this wife." Plaintiff told the NY-based manager that his wife was not at the retreat, so nothing would happen that night. She said that she would contact Plaintiff and his wife to ask them out on a date next time she visited Washington, DC. Later, she propositioned Plaintiff again and offered him oral sex. Plaintiff declined. Plaintiff texted and called his wife that night and the next day and described exactly what happened. Plaintiff saw the NY-based manager twice the next day. They said goodbye and exchanged hugs before parting ways at the end of the retreat.

72.     On Monday June 5, 2018, immediately after coming back from the staff retreat, Plaintiff contacted his Union shop stewards to request that the Union submit a written grievance because no meeting had taken place at the staff retreat. He had a draft ready, and he scheduled a telephone conversation with one of his

shop stewards the next day, June 6, 2018, to finalize and submit the written grievance alleging discrimination and retaliation.

73.     On June 6, 2018, the same day Plaintiff was scheduled to submit his Union grievance alleging discrimination and retaliation, Ianantuoni entered Plaintiff's office at work and asked Plaintiff to follow him to another office. Plaintiff sat down with Ianantuoni and another AIUSA human resources employee, Lloyd McIntosh. Ianantouni asked if Plaintiff "had sex with anyone during the retreat." Plaintiff responded no, he had not, and asked whether he was being accused of something. Ianantouni refused to answer Plaintiff, and he asked him about the events that took place during the retreat. Plaintiff told Ianantuoni about his exchange with the NY-based manager at the retreat and said that was the only incident of sexual nature that took place. Ianantouni handed Plaintiff a letter placing him on indefinite administrative leave and informing him: "In addition, you are prohibited from having any direct or indirect contact with any AIUSA employees. You are also prohibited from coming onto AIUSA property unless I (or my designee) notify you in advance that you are invited." Ianantouni confiscated Plaintiff's laptop, gave him two minutes to exit the office, and instructed McIntosh to escort Plaintiff out.

74.     Plaintiff, alarmed by the fourth investigation, emailed Terry Rockefeller, a member of the Board of Directors of Defendant AIUSA, that evening. In his email, Plaintiff wrote:

> "I've been having a very difficult time with management for a couple months now, and I was placed on administrative leave today, escorted out of the office, and cut off from email access.
>
> Things were going really well for the first 6 months. I had some pushback against my work on Israel/Palestine, but nothing out of the ordinary. My probationary period review was excellent - I exceeded expectations! But on April 9th, I helped deliver a petition to Margaret [Huang] requesting that our interns get paid. She didn't like it at all, and reprimanded everyone who signed the petition. She told us that in the future, instead of using petitions as an organizing tool, we should request meetings with her because "petitions are hostile by nature". A number of staff members, including myself, felt like her response was so aggressive that our jobs were in jeopardy. And now, I've been under investigation and attacks by her and the management team ever since.
>
> I was very concerned and told the management team that I feel like I'm being retaliated against because of my role with the intern petition.

> We had a couple of meetings between management and the union to discuss this before the staff retreat, and I've decided to file an official grievance through the union (as my email pasted below shows) and management backed off. Today was the day I planned to file the grievance. Instead, as of today I'm being investigated and accused of misconduct at a party that happened during the staff retreat. The person leading the investigation is the interim HR director who was also involved in management's response to the intern petition (he is included in my grievance)."

75.  Plaintiff asked Rockefeller for an independent investigation: "The reason why I'm contacting you is that I'm hoping you can play a role in ensuring this investigation is impartial and independent. After all the back and forth tension, I don't trust that our management team, led by Margaret [Huang], will conduct a fair investigation. Is there anyway [sic] you or the board can help ensure we have an independent investigation led by an external consultant rather than giving management the lead?"

76.  Plaintiff concluded the email: "I'm so disappointed at the way Margaret [Huang] and the management team have overreacted to this paid internship issue - ordering us to refrain from signing petitions was the last thing I thought would happen to me at Amnesty International of all places. I'm also heartbroken by the way I've been treated in the last couple months - I truly believe that some racist and Islamophobic assumptions contributed to this escalation. This has been an extremely stressful situation for me and I can't believe that it has gotten to this point."

77.  Also on June 6, 2018, Plaintiff sent an email to Ianantuoni requesting more information about the fourth investigation of his alleged conduct, since he did not have information about the nature or content of the allegations.

78.  On June 7, 2019 Ianantuoni emailed Plaintiff in reaction to his contact with Rockefeller, prohibiting him from contacting any Defendant AIUSA Board members:

"In followup to my memo yesterday in which I instructed to you to refrain from contacting AIUSA employees, this is to inform you that you are also prohibited from contacting members of the Board or AIUSA members or volunteers during your administrative leave. Any questions you have should be directed to Margaret [Huang] or me. Failure to act in accordance with these restrictions will be considered insubordinate. As I said yesterday, you will have the opportunity to provide your perspective as part of AIUSA's investigation."

79.     Also on June 7, 2018, Plaintiff emailed Huang and Ianantuoni requesting an independent investigation, access to an attorney during the proceedings, and access to his work schedule to be able to cancel meetings with high-level government officials so that his professional reputation would not suffer from his sudden and unexplained absence. His email read in part:

> "1- Taking in consideration the grievance I'm filling through the union about the retaliation to my role with the interns' petition, I would like to request that any investigation into the most recent complaint be handled by an independent, third party. As the management team knows, I was planning to file an official grievance regarding the retaliation I've been dealing with since the petition delivery. As a matter of fact, I was finalizing my grievance text with my shop steward yesterday. The management team, including yourself, are implicated in my grievance. I know you mentioned yesterday that there is no investigation yet, but in case things move in that direction would you be willing to recuse yourself from leading the Investigation and getting an outside person/firm to lead it? I'm very concerned about the fairness of an investigation if it's led by you or the management team.
>
> 2- I need access to my work calendar and emails to cancel all the meetings I have. Many of these meetings are high level meetings with the White House, Department of State, DoD, and other government agencies. Can I contact my supervisor or the IT department to gain access to the information without tampering with the investigation?
>
> 3- when you contact me to conduct the investigation, I request that my union representative be present. Do I also have the option to have my attorney be there as well?"

80.     On June 8, 2018, Plaintiff contacted the National Labor Relations Board (NLRB) and on June 11, 2018, Plaintiff signed and filed NLRB charge 05-CA-221952 against Defendant AIUSA over its response to the interns' petition.

81.     On or around the week of June 11, 2018, the Union emailed Ianantuoni to request more information about the investigation since the allegations and nature of the investigation had not been disclosed by Defendant AIUSA.

82.     On June 12, 2018, for the first time in his life, Plaintiff start seeing a psychiatrist, and was prescribed medications after being diagnosed with severe anxiety.

83.     On June 13, 2018, Ianantuoni responded to Plaintiff via email with, in part:

"1. I will conduct the investigation, and it will be conducted thoroughly. When we receive a grievance, we will respond accordingly. 2. Your appointments and calendar will be reviewed and managed by your supervisor. 3. As is your right a shop steward/union representative may be present when we speak. You do not have the right to bring an attorney."

84.    On June 27, 2018, Plaintiff emailed Ianantuoni requesting more information about the investigation since the allegations and nature of the investigation still had not been disclosed to him or the Union by Defendant AIUSA.

85.    On July 5, 2018, Plaintiff saw a psychotherapist for the first time in his life and was diagnosed with severe anxiety.

86.    On July 5, 2018, still without information about the allegations against him or the nature of the investigation, the Union again requested information from Defendant AIUSA management: "Once again, the union requests that you share with us the nature of the allegations or complaints that led to Raed Jarrar being placed on paid leave." The email concludes with: "the union believes that member Jarrar has a right to know the general nature of the allegation or complaint prior to participating in the upcoming investigatory interview."

87.    On July 10, 2018, Plaintiff, by his counsel, sent an electronic letter to Huang demanding an immediate end to his indefinite administrative leave, and end to discrimination and retaliation against him, and removal of all documentation related to his indefinite administrative leave and false and defamatory charges against him.

88.    On July 11, 2018, Plaintiff, by his counsel, sent a request to Huang to preserve all electronically-stored information related to Plaintiff's case.

89.    On July 11, 2018, Plaintiff went to the Defendant AIUSA office for an investigation interview. Ianantuoni and Marcela Bringas von Rabenau (National Director, Street Canvassing) were both present. Plaintiff's Union representative, Kevin Lynch, participated in the meeting by telephone. After conferring with Lynch, Plaintiff audio-recorded this meeting. Ianantuoni told Plaintiff for the first time that the NY-based manager (who had propositioned him sexually at the staff retreat) had filed a complaint against him. He was asked to recount all the details of the night in question during the staff retreat. Then, Ianantuoni asked Plaintiff specific questions about the events that night where he implied a number of serious allegations, such as false imprisonment. Around 28 minutes into the interview, Ianantouni asked: "Did you block her from actually leaving your room?" to which Plaintiff responded: "Absolutely not!" Plaintiff followed up by asking: "I assume that your questions are based on allegations that were made by [the NY-based

manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?" Ianantuoni answered: "Yes, sir. That's why we're here today."

90.     Plaintiff was shocked to hear that there was a complaint filed by the NY-based manager who approached him and propositioned him. He was extremely alarmed by the allegations, especially Ianantuoni's allegations of false imprisonment, which were later revealed to be manufactured by AIUSA.

91.     During the July 11, 2018 interview, Plaintiff described in detail what happened during the after-party and denied any inappropriate or unwanted actions during the exchange with the NY-based manager.

92.     On July 20, 2018, after 45 days on administrative leave, Plaintiff participated in a telephone call with Ianantuoni and Plaintiff's supervisor, Lin, and Kevin Lynch from the Union. On that call, Defendant AIUSA informed Plaintiff that he was terminated effective immediately. Ianantuoni read a termination letter over the phone. He later emailed it to Plaintiff. The letter read:

> "Dear Raed [Jarrar]: This confirms that your employment with AIUSA is being terminated, effective today, due to your inappropriate conduct toward a female coworker at the organizational retreat on May 30, 2018. Although you disputed your coworker's allegations, AIUSA found her description of events credible. She alleged that you made repeated unwanted sexual overtures toward her, including making comments about her body, suggesting sex that night, attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner. AIUSA takes such misconduct very seriously and, given the severity of the incident, has determined that discharge is appropriate. Information about benefits continuation will follow separately."

93.     This was the first time Plaintiff or the Union learned about the charges, and Plaintiff denied all of them. Defendant AIUSA never provided him with a precise statement of charges before the day of his termination, and Defendant AIUSA never gave him an opportunity to respond to the charges, provide a counter statement, offer any explanation, or submit evidence and additional witnesses.

94.     Plaintiff and the Union were startled by the lack of due process. Defendant AIUSA policy manual suggests that a typical investigation would include "putting statements from each party in writing," which Plaintiff did not have the opportunity to do. It also describes an appeal process (separate from the Union's grievance process), stating that if either party was "dissatisfied with the results of

the investigation," they may "discuss it directly with the Executive Director." Plaintiff was presented with the findings of the investigation only when his employment was terminated, and he was never given the opportunity to discuss it with Executive Director Huang.

95.    The section about harassment in Defendant AIUSA's policy manual is narrowly defined and mirrors definitions in US law: it requires Defendant AIUSA not only to prove that Plaintiff made unwanted advances but also to show that the alleged actions were a basis for employment decisions or had the effect of unreasonably interfering with someone's work performance or creating a hostile work environment.

96.    During the 45 days while he was places on indefinite administrative leave, Plaintiff was forced to miss numerous meetings and events without being able to cancel or reschedule, including meetings with the White House, Department of State, Department of Defense, Congress and meetings with other external partners. Plaintiff had to cancel local and international trips, decline media interviews with US and international media outlets, miss public speaking events, and disappear from his entire work community.

97.    After Defendant AIUSA's unjust and retaliatory termination of Plaintiff, he had to seek additional medical attention. He was prescribed additional hypertension medication because of extreme anxiety.

98.    On July 20, 2018, Plaintiff had a phone call with Lynch immediately after his employment was terminated. In that call, Plaintiff decided to fight his termination. He began to gather evidence to supply to the Union.

99.    Plaintiff quickly reached out to the Normandy Farm Hotel and Conference Center where the events in question at the retreat took place. He contacted the hotel directly, and by counsel, to request copies of the surveillance footage during the relevant times and the relevant areas to disprove the allegations and charges against him.

100.   On or around July 21, 2018, Union representative Lynch told Plaintiff that he would request more information about the termination because the Union's contract with Defendant AIUSA states that "no employee covered by this agreement shall be disciplined or discharged except for just cause."

101.   On July 23, 2018, the Union requested all relevant paperwork in an email to Ianantuoni, reading: "...in preparation for filing a grievance over the termination of union member Raed Jarrar, the Union requests all documents, correspondence, meeting notes and reports which formed the basis for the decision to terminate Jarrar's employment on July 29, 2018."

102.    Also on July 23, 2018, based on information and belief, a volunteer leader at Defendant AIUSA contacted Huang to inquire about what happened with the Plaintiff. Huang told him that "at the end it was a challenging situation but ultimately an easy decision to make." In that same conversation, Huang said that Plaintiff was involved in "inappropriate conduct toward another employee." This statement is both false and defamatory.

103.    On July 24, 2018, Plaintiff attempted again to contact the Normandy Farm Hotel and Conference Center by both phone and email requesting copies of the surveillance tapes in the hotel. Plaintiff's email read, in part: "we fear that the electronically stored information, including security camera recordings, might be lost if not preserved as soon as possible."

104.    On July 25, 2018, a representative from the Normandy Farm Hotel and Conference Center, David S. Sherman, responded to the Plaintiff with an email: "...Just today, others in our organization have received about 25 calls and e-mails about this matter, but I am the right person to talk to.  My contact info is below.  I am happy to try and help."

105.    On a later date, the hotel informed Plaintiff, by his counsel, that they no longer had footage from the surveillance cameras from the relevant dates.

106.    On July 25, 2018, a volunteer leader with Defendant AIUSA had a phone call with Defendant AIUSA's legal counsel. Notably, the counsel relayed to the volunteer leader that he has advised Defendant AIUSA not to use language pertaining to "sexual harassment" or "inappropriate conduct" in public communications pertaining to Plaintiff: "My conference call was with Ulana [Moroz], Daniel from the counsel's office, Bart [Ianantuoni] the new head of HR (he led the investigation), and Joanne Lin…. There was more, but all in this vein and most of the questions I asked I was told covered confidential material. When I raised issues of sexual harassment, Daniel insisted that they will not use that word in public discussions. When I told him Margaret [Huang] had used the phrase inappropriate conduct toward another employee, he said he would not use that phrase either."

107.    On July 26, 2018, Union representatives received a copy of the 8-page final investigation memorandum sent by Ianantuoni to Huang. Union representative Lynch called Plaintiff and told him over the phone, "This investigation is a bunch of bullshit and the union will fight it."

108.    The final eight-page investigation memorandum falsifies and misquotes Plaintiff's statements during the July 11, 2018 investigatory interview. The memorandum misrepresents what Plaintiff said about the events that took place on

the first floor and omits all his statements about the events that transpired on the second floor. The memorandum misquotes the facts Plaintiff related for events (including the times and locations) and misrepresents statements made about other people involved. Ianantuoni used the falsified information to support the conclusion that the Plaintiff was guilty of misconduct. Plaintiff's audio recording of the entire July 11 investigatory interview exposes the discrepancies between what Plaintiff actually said and what Ianantuoni reported that he said.

109.   The Union reviewed the 8-page final investigation memorandum, noted its discrepancies and falsifications, and concluded the termination was unjust.

110.   According to Defendant AIUSA's own findings, there were no eyewitnesses to the events in question. The first page in Defendant AIUSA's own original investigation document reads: "Witnesses: None."

111.   According to Defendant AIUSA's own findings, the only person who was in the room immediately before and after the events in question- and corroborated Plaintiff's narrative- was a DC-based manager: "The situation made [the DC-based manager] uncomfortable because of their body language and their sitting close to one another. [The DC-based manager] knew that [NY-based manager] had a boyfriend, and if [the DC-based manager] had been [her] boyfriend and saw the situation, it would make the boyfriend uncomfortable," and "[the DC-based manager] was uncomfortable that she knew they were both in relationships and yet they were flirting."

112.   On July 30, 2018, the Union sent a message to Ianantuoni challenging the termination of Plaintiff and demanding his reinstatement:

> "Bart [Ianantuoni] ... Written on behalf of CWA Local 1180, this email constitutes the official filing of our grievance over the unjust termination of AIUSA's employment of our union member Raed Jarrar on July 20th, 2018. At that time, you informed Jarrar that his employment was being terminated immediately based on a Human Resources investigation of events that took place on the evening of May 30th, 2018. The Union asserts that there was not just cause for firing Jarrar under the terms of our labor contract because management's conclusion that he engaged in "inappropriate conduct toward a female coworker" was not supported by the investigation or any other evidence. Therefore, the Union demands that Raed Jarrar be reinstated to his position at AIUSA with the return of lost wages, seniority and benefits, and all references to the events of May 30th be removed from his personnel files. Given the nature and scope of this case, we propose moving immediately to a Stage 2 Grievance. If you

> agree, please let us know when the Executive Director or
> Representative(s) can engage in a Stage 2 Grievance procedure with
> the Union."

113.  In or around August 2018, based on belief and information relayed to
Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was
"caught red-handed sexually assaulting a young intern" and that "witnesses were
present." These statements are both false and defamatory.

114.  In or around August 2018, based on belief and information, AIUSA
informed members of the Board of Directors of Defendant AIUSA that the incident
leading to Plaintiff's termination "was not a he said/she said situation, and there
was a witness(es) to some behavior." This statement is both false and defamatory.

115.  On August 8, 2018, the Union sent another email to Ianantuoni requesting
eight additional relevant documents to prepare for a Step Two grievance hearing.
This request included copies of the original complaint filed by the NY-based
manager and copies of all transcripts of interviews conducted by Defendant
AIUSA in the course of its fourth investigation.

116.  On August 29, 2018, the Union received the documents it had requested.
After reviewing the documents, including the original complaint filed by the NY-
based manger and transcripts of follow-up interviews, Plaintiff and the Union
realized that the allegations against Plaintiff as stated in his termination letter were
either editorialized, exaggerated or manufactured by Defendant AIUSA.

117.  In the termination letter, Defendant AIUSA claimed that: "she alleged that
you made repeated unwanted sexual overtures toward her," including "attempting
to kiss her after she asked you not to do so, and pressing your body against her in
an intimidating manner."

118.  Plaintiff categorically denies all the allegations against him, but the actual
allegations of the NY-based manager, as described in her own words in three
interviews with her, **do not match** what AIUSA claims to be her allegations.

119.  The NY-based manager's statement does not mention or describe "repeated
unwanted sexual overtures towards her." Her allegation is that when Plaintiff went
to kiss her, "she did not stop him but was visually uncomfortable." Then, in a
quote from a follow-up interview that was conspicuously omitted in Defendant
AIUSA's final investigation memorandum, she confirms that: "I am bothered that I
didn't shut it down. I honestly didn't know how to react. I was nervously giggling -
he probably took that as if I was flattered." She also admits she called Plaintiff
"attractive" and "gorgeous."

120.   In her own words, the NY-based manager does not mention or describe Plaintiff "attempting to kiss her after she asked [him] not to do so." Her allegation is that she said: "please don't kiss me," so Plaintiff complied and "turned his head away from her." Then in a quote from her follow-up interview that was conspicuously omitted from Defendant AIUSA's final investigation memorandum, she said: "I kissed him back because I didn't want to but I have no idea why I did."

121.   Nowhere in the entire investigation report, interviews or complaint does the NY-based manager mention the word "intimidating" or any words to that effect.

122.   The allegations of the NY-based manager would neither constitute a quid pro quo sexual harassment nor a hostile work environment under Defendant AIUSA's employee manual, which states:

> "Sexual harassment includes any unwelcome sexual conduct on the job, including sexual advances, requests for sexual favors, and/or other verbal or physical conduct of a sexual nature when:

> * Submission to, acceptance of, or rejection of such advances, requests or conduct is made either explicitly or implicitly a term of employment or as a basis for employment decisions.

> * Such advances, requests or conduct have the purpose or effect of unreasonably interfering with an individual's work performance and/or creating an intimidating, hostile, humiliating or offensive work environment."

123.   After reviewing the additional documents, including the transcript and investigation questions from the July 11, 2018 investigatory interview, Plaintiff and Union representatives realized that Ianantuoni intentionally manufactured the "false imprisonment" question on July 11, 2018. Ianantuoni read all other questions before and after that directly from the prepared document, but he improvised the false imprisonment question.

124.   But for Plaintiff's role in the interns' petition, Defendant AIUSA would have not terminated him based on a series of sudden illegitimate investigations. As the evidence shows, immediately after leading the petition, Plaintiff was suddenly portrayed as a misogynist man with negative gender dynamics with his female colleagues, deploying an anti-Arab and Islamophobic trope to retaliate against him. The first three investigations are clear examples of how Defendant AIUSA editorialized, exaggerated, and in some cases, manufactured complaints against Plaintiff. The fourth and final investigation follows suit: the final investigation memo intentionally or negligently misquotes plaintiff, omits key facts, editorializes, exaggerates, or manufactures events to justify its conclusion.

Defendant AIUSA's stated reason for Plaintiff's termination is pretextual, and the findings of Defendant AIUSA's fourth investigation do not constitute a legitimate nondiscriminatory business reason for Plaintiff's termination.

125.   On August 31, 2018, Union representative Lynch emailed Ianantuoni with a formal request for "three witnesses to be present at some point in our meeting." This request was in reference to Step Two grievance hearing.

126.   On September 5, 2018, Defendant AIUSA shared information about previous investigations of misconduct at AIUSA. Based on information and belief, similarly situated staff not of Plaintiff's national origin, race or religion were treated differently by Defendant AIUSA. Moreover, based on information and belief, other more serious incidents were ignored, not investigated or concluded without serious consequences, including a very serious misconduct incident in August 2016.

127.   Also on September 5, 2018, Plaintiff attended the Step Two grievance hearing. Plaintiff recorded the entire meeting. Huang refused to allow Plaintiff or the Union representative Lynch to interview any witnesses or ask any questions. She also instructed Ianantuoni not to answer any questions. Although Section C of Article 10 of the collective bargaining agreement states: "Any necessary and relevant witness shall be excused from work for the time required to provide his/her statement at the meeting," During the meeting Huang told Plaintiff that "we're not going to provide people to respond to questions in the stage two process."

128.   During this September 5, 2018 hearing, Plaintiff and Lynch presented documents to Defendant AIUSA officials showing in detail how the allegations, based on the investigation interviews, transcripts and statements, did not match those in the termination letter. In addition to other evidence mentioned above, Lynch said: "By her own account, [NY-based manager] implies a consensual conversation since she admitted in her final interview that it all boiled down to a "blurred consent line." Yet never a line that was crossed."

129.   During this September 5, 2018 hearing, Plaintiff commented at the lack of due process by saying: "I do want to share Kevin [Lynch]'s frustration about the process that we're going through today. I feel that unfortunately there are not enough checks and balances in this process. The investigator, jury, judge, executioner, and court of appeals seem to be the same person." As the meeting was coming to a close, Lynch commented: "I don't think it was a fair process and I'm astounded by it frankly."

130.   On September 7, 2018, Plaintiff, by counsel, sent a letter to Defendant AIUSA's legal team outlining the discrepancies between the allegations in the termination letter and the actual findings. The letter also discusses the discriminatory and disparate treatment of Defendant AIUSA: "Finally, after speaking to former employees, Mr. Jarrar's understanding is that more serious incidents in the past at AIUSA were ignored, not investigated or concluded without serious consequences, including an actual verifiable sexual assault incident in August 2016. The discipline of termination and then defamation was disproportionate and unreasonable and constitutes not only retaliation, but also disparate treatment given other employees' serious conduct issues. Mr. Jarrar believes that he was not treated fairly or equally because Ms. Huang and Mr. Ianantuoni were retaliating against him based on his protected concerted activity in March and April 2018." The letter concludes: "He also believes that many of the accusations AIUSA management have used to attack him had discriminatory undertones. Even before the final investigation was launched, which led to his wrongful termination, Mr. Jarrar had already been portrayed as an Arab Muslim-American man with "gender dynamic" issues, which is patently false."

131.   Also on September 7, 2018, Plaintiff, by counsel, sent a cease and desist letter to Defendant AIUSA's counsel. The letter states: "The purpose of this letter is to notify you that Margaret Huang has been defaming my client, Raed Jarrar, which has caused damage to his reputation." The 4-page letter concludes with "This is false and constitutes defamation per se. By this letter I am demanding that you counsel your client to cease and desist from defaming my client."

132.   On September 14, 2018, Plaintiff filed a charge with the EEOC. The grievance and the EEOC charge addressed two different wrongs. The grievance invoked the "Just Cause" clause of the collective bargaining agreement because Plaintiff was not guilty of any dischargeable offense. In contrast, the EEOC charge alleged that Defendant AIUSA's actions were discriminatory and retaliatory in violation of Title VII.

133.   On October 2, 2018, the Union sent its Notice of Arbitration to Huang, stating: "Please accept this email as a notice that the Union plans to arbitrate the grievance for Mr. Raed Jarrar.  Please confirm your acknowledgement of this email."

134.   On October 22, 2018, Defendant AIUSA, by counsel, sent a letter to Kevin Lynch, Union Representative, causing the Union to withdraw Plaintiff's grievance. The letter read: "As you know, Raed Jarrar, a former employee of Amnesty International USA, Inc. ("Amnesty"), filed a grievance challenging his discharge from employment under the collective bargaining agreement between the

Communication Workers of America, Local 1180 ("Union") and Amnesty. Amnesty has just received the attached Charge of Discrimination in EEOC 570-2018-03577 from Raed Jarrar. Therefore, as provided in Article 4C of the collective bargaining agreement between Amnesty and the Union 'any grievance or arbitration proceedings concerning that claim which are occurring or which may have already taken place shall be terminated.' Please let me know if you have any questions or concerns."

135.   On October 24, 2018, after the request by Defendant AIUSA, the Union informed Plaintiff of its intent to withdraw his grievance from arbitration. At issue was Defendant AIUSA's reliance on Article 4(C) of the collective bargaining agreement to withdraw the grievance that had been filed. Article 4(C) reads:

> "If at any time an employee files a claim of discrimination with any state or federal agency or court, the employee thereby waives the right to bring or maintain a grievance or arbitration over the subject matter of that claim, and any grievance or arbitration proceedings concerning that claim which are occurring or which may already have taken place shall be terminated and obligation imposed upon the employer shall be rendered null and void."

136.   The grievance and the EEOC charge address two different wrongs. The grievance invokes the Just Cause clause. The case for discriminatory and retaliatory motivation for the termination in violation of Title VII was the one made to the EEOC. Depriving Plaintiff of the right to grieve his contract violation because he filed an EEOC charge, even if unrelated to the EEOC charge, is discriminatory and retaliatory.

137.   In or around October 27, a volunteer with Defendant AIUSA approached Njambi Good to inquire about the lack of due process in Plaintiff's case. The volunteer asked why Defendant AIUSA management denied Plaintiff's request for an independent, third-party investigation. Good told the volunteer that based on information she had reviewed, "even if an independent firm had come in and done the review, they would've reached the same conclusion." This statement is both false and defamatory.

138.   On January 16, 2019, the NLRB hearing took place. The NLRB complaint alleged that Defendant AIUSA violated the National Labor Relations Act (NLRA) in several respects. At the hearing, Plaintiff testified and presented audio evidence. Although the circumstances of his indefinite administrative leave and termination were not an issue in the case, and although Defendant AIUSA has been notified multiple times by Plaintiff that allegations in the termination letter are false even according to Defendant AIUSA's own investigation, Defendant AIUSA sought to

impeach him by introducing his termination letter. The effort failed but the termination letter was entered into the hearing record.

139.   On March 18, 2019, the NLRB publicly posted the Administrative Law Judge's (ALJ) decision on its website. The ALJ ruled in Plaintiff's favor and found that Defendant AIUSA violated the law by:

   a.   "threatening employees with unspecified reprisal because they engaged in protected concerted activity,"

   b.   "equating protected concerted activity with disloyalty,"

   c.   "requesting employees to report to management employees who are engaging in protected concerted activity," and

   d.   "instructing employees to communicate complaints to management orally before submitting complaints in writing."

140.   On March 20, 2019, Hassan Ali from the media outlet Bloomberg Law contacted Plaintiff to notify him the reporter was investigating the NLRB ruling. Ali also requested to discuss the matter further with Plaintiff. Plaintiff established contact and various communications ensued.

141.   Plaintiff limited his exchange with Ali to issues pertaining to the petition, interns' payment, and Defendants' hypocrisy of not practicing what it preaches.

142.   On March 22, 2019, after reaching out to Defendant AIUSA, Ali emailed Plaintiff: "the org's stance is this was all totally about sexual harassment; I did say to them that I expect they'll be able to detail the allegations/incident a bit more, given that they've investigated and reached a conclusion. They said they'd check with legal regarding how much they can/should say, and got back a bit later to say they'd have full responses for me on Monday (I sent a long, detailed list of questions/fact-checking issues)."

143.   On March 22, 2019, Ali sent Plaintiff a message to inform him of the following: "I've just spoken with some folks at Amnesty, and am about to send them a list of fact-checking questions/issues. I'll tell you a bit more when we chat but generally, they were adamant that the real issue here is that you were dismissed for a valid, thoroughly-investigated harassment claim, and that you're now trying to get back at the org via various complaints."

144.   On March 23, 2019, Amanda Simon wrote to Ali via email, sharing with him Plaintiff's termination letter: "Thanks, Hassan. I'm attaching the termination letter here to provide off the record context. We're comfortable sharing this as it was entered into the record during the NRLB hearing."

145. On March 26, 2019, Ali sent Plaintiff the following message within an email, including information from Defendant AIUSA which is both false and defamatory: "This, a portion of Amnesty's answers to me, summarizes their general response (which also suggests you're engaging in a "smear campaign"): 'In keeping with Amnesty International USA personnel policies, we maintain to the greatest degree possible an employee's confidentiality on matters related to their employment. Unfortunately, though, Mr. Jarrar has chosen to engage in public discussions with media and staff about the circumstances related to his termination. Accordingly, we felt it was necessary to respond to these false and harmful allegations. To be absolutely clear: Mr. Jarrar was terminated following a complaint of sexual harassment by a coworker, and a thorough investigation found her version of events credible. Any allegation that this is part of a conspiracy or setup is deeply offensive and wholly untrue. We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim. We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them.'"

146. In addition, on or around March 26, 2019, Simon and Ben Wyskida, CEO of Fenton Communications, on behalf of Defendant AIUSA, provided Bloomberg Law with this statement, which is both false and defamatory: "We received a complaint of inappropriate sexual conduct and were required by law and our policy to conduct an investigation. We then took appropriate action. We stand with the victim. We reject the effort to shift the blame by naming that person publicly in an attempt to intimidate and silence them."

147. By sharing this information with Bloomberg Law, Defendant AIUSA published false and defamatory statements without privilege to a third party.

148. On March 28, 2019, in a letter to the EEOC, Defendant AIUSA wrote the following, which is both false and defamatory: "We are advised that [Plaintiff] has recently undertaken a series of communications to the media and Defendant AIUSA employees apparently seeking, inter alia, to intimidate the victim who filed a complaint against him and to retaliate against her for exercising her rights under both Title VII and Defendant AIUSA's anti-harassment policy to be free of sexual harassment."

149. Plaintiff categorically denies naming the NY-based manager publicly (or in communications with Defendant AIUSA employees) or attempting to intimidate or silence her.

150. By sharing this information with the EEOC, Defendant AIUSA published a false and defamatory statement without privilege to a third party.

151.   On April 4, 2019, Bloomberg Law published a story that includes the exact language from the termination letter. Bloomberg erroneously attributed the allegations in Plaintiff's termination letter to the NY-based manager (emphasis added):

> "Then came the sexual harassment complaint, arising from an incident between Jarrar and a manager from Defendant AIUSA's New York office during an organizational retreat.
>
> **The manager said Jarrar made "repeated unwanted sexual overtures toward her, including making comments about her body, suggesting sex that night, attempting to kiss her" and "pressing [his] body against her in an intimidating manner," according to the termination letter. Jarrar said he didn't know the woman before the retreat."**

152.   After the publication of the article, Plaintiff's final-round interview for a new job was abruptly cancelled, although he was a strong candidate for the position.

153.   Also after the publication of the article, during another job interview, the hiring panel placed a copy of the Bloomberg Law article on the table and asked Plaintiff to explain. Although he was a strong candidate, Plaintiff did not get that job.

154.   On April 5, 2019, a Country Specialist in Defendant AIUSA's Middle East Coordination Group, who is a former colleague of the Plaintiff, started an email chain on an internal list where she posted the Bloomberg article. Another Country Specialist from the same coordination group replied with concerns about how Plaintiff was treated: "I was also concerned about what seemed to be 'selective leaking' of information which portrayed the charges against him as incredibly serious and shameful and undisputable." She added: "I felt this 'selective leaking' was a violation of personnel confidentiality and prejudicial." A third Country Specialist from the same group replied: "I am really, really uncomfortable with the disclosure of the details of Raed [Jarrar]'s termination, with any attempts to discuss his case in this public forum, and with any discussion that invites speculation about what we cannot know." She added: "I was sorry to see him go, because he was good at his job and because I personally felt more respected and treated as a colleague by him than I have felt very often in AIUSA in the last decade or two." Another country specialist replied to the thread: "Raed [Jarrar] was hustled out of his office the very day he was going to file an official grievance and this fact was known to many people. Timing was very "strange" to put it mildly. He was then put on leave and not told about the particulars of the accusation against him and

did not have an opportunity to have a fair hearing before he was terminated. I believe it is our responsibility to insist that people in the organization are treated fairly and provided with due process. The charge made against Raed [Jarrar] is very serious and has the potential to negatively impact his professional life in the future. The charge was made public by senior management --- I had been under the impression that details about reasons for termination were considered confidential personnel matters and not to be disclosed?."

155.   In response, Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent the following email to an internal listserv, which is both false and defamatory: "AIUSA terminated Raed Jarrar as a result of a credible sexual harassment complaint. AIUSA is strongly committed to taking sexual harassment claims seriously. In this situation, the harasser was terminated. AIUSA is legally bound to defend this action or risk that the harasser will be reinstated to our workforce. Our legal representation remains the same and litigation costs are being managed."

156.   The back-and-forth continued with Farrar repeating Defendant AIUSA's false and defamatory narrative. Another AIUSA affiliate on the list replied back: "That 'Raed [Jarrar] was hustled out of his office the very day he was going to file an official grievance and this fact was known to many people,' is unconscionable, and none of the Board responses have disputed this fact. Then the allegations of sexual harassment were aired, which does not seem right, and the Board seems to be saying the people accused of sexual harassment don't have a right to a fair hearing."

157.   On April 15, 2019, Farrar emailed the listserv again, with statements which are both false and defamatory: "First, this situation involves a personnel issue, which Defendant AIUSA would not normally address.  However, because the employee continues to allege that he was discharged in retaliation for protected activity, although he voluntarily withdrew that charge, AIUSA had to present a copy of his termination letter to the NLRB Administrative Law Judge to respond to the employee's false narrative.  Then, when he gave the name of the sexual harassment victim to the press and the press contacted her, AIUSA immediately sought to protect the victim from being further victimized.  While I understand that there are supporters of the former employee, I urge you all to consider the fact that that former employee provided the press with the name of the victim and encouraged them to get in touch with her, which they did. To my mind, that's unconscionable behavior but I expect we all have different standards."

158.   By sharing this information on the listserv, Defendant AIUSA published a false and defamatory statement without privilege to a third party.

159. Based on belief and information, the week after the exchange on the listserv, Defendant AIUSA investigated the same Middle East and North Africa coordination group members who criticized Defendant AIUSA's treatment of Plaintiff. They were investigated for supposed "misconduct" and "sexual harassment" that took place at an AIUSA event six weeks before the listserv exchange. Members of the group, mostly women, were subjected to elaborate investigations and gag orders that lasted for almost two months.

160. Based on belief and information, at the conclusion of the investigations, members of the groups were sanctioned and reprimanded.

161. After Defendant AIUSA published false and defamatory statements about Plaintiff, he had to seek additional medical attention. He was prescribed heart medication for palpitations caused by extreme anxiety.

162. On May 28, 2019, Defendant AIUSA sent a Statement of Position to the EEOC. The statement falsely claimed that Defendant AIUSA did not know Plaintiff was Muslim, claiming that Plaintiff "did not adhere to cultural norms often identified with the Muslim Religion. For e.g., Jarrar did not fast during the Staff Retreat which was during Ramadan and was drinking alcohol at an AIUSA retreat." The statement also reiterates Defendant AIUSA's false and defamatory claims that "All of the interpersonal relationship issues involving Jarrar related to this specific interactions or involvement with women. In many instances, the women with whom he was interacting felt disrespected and ignored when Jarrar did not listen to their suggestions, talked over them, told them what to do, and did not follow through with agreements to include them in conversations related to their work and jobs." The statement also claims that: "The allegations as to excellent performance are false based on, inter alia, his poor treatment of female co-workers and his sex harassment of an AIUSA employee." Defendant AIUSA's statement of position is false and it expands on Defendant AIUSA's use of Islamophobic and racist tropes.

## COUNT I

### DISCRIMINATION

163. Plaintiff realleges and incorporates all the factual allegations above.

164. By its actions and statements, including but not limited to, the investigations (which included deploying anti-Arab and Islamophobic tropes), indefinite administrative leave, termination, and subsequent false and defamatory statements about him, and retaliation for his having filed an EEOC charge against Defendant

AIUSA and his having opposed discriminatory practices by Defendant AIUSA and causing the Union to withdraw his grievance and thus deprive Plaintiff of his right to protest the absence of just cause in his termination and to arbitrate his grievance, Defendant AIUSA engaging in statements and actions reflecting a discriminatory animus towards Plaintiff on the bases of race, gender, religion, and national origin, in violation of Sections 2-1402.11(a)(1) (discrimination and retaliation because of race, gender, national origin, and religion), 2-1402.61(a) and (b) (discrimination and retaliation for opposing unlawful practices) and 2-1402.62 (aiding and abetting unlawful acts).

## COUNT II

## RETALIATION

165.  Plaintiff realleges and incorporates all the factual allegations above.

166.  By its actions and statements, including but not limited to, threatening, discriminating, and retaliating against plaintiff, within 90 days of exercising his rights under Chapter § 32–13 of the DC Code, Defendant AIUSA violated DC Code § 32–1311(discrimination and retaliation for advocating against wage theft and wage and hour violations). Defendant AIUSA further retaliated against Plaintiff with subsequent false and defamatory statements about him, and by causing the union to withdraw his grievance from arbitration after he filed an EEOC charge against Defendant AIUSA and thus deprive Plaintiff of his right to protest the absence of just cause in his termination and to arbitrate his grievance. DC Code Sections 2-1402.11(a)(1) (discrimination and retaliation because of race, gender, national origin, and religion); 2-1402.61(a) and (b) (discrimination and retaliation for opposing unlawful practices) and 2-1402.62 (aiding and abetting unlawful acts)

## COUNT III

## DEFAMATION

167.  Plaintiff realleges and incorporates all the factual allegations above.

168.  The false accusations perpetuated by Defendant AIUSA and the publication and republication of the false statements, including the termination letter, proximately caused general and special damages to Plaintiff. Defendants knew, anticipated, foresaw, and intended that the termination letter would be read by persons throughout the United States and the world and would damage the

reputation of the Plaintiff. This action, as well as the false rumors, have adversely affected Plaintiff's professional reputation, professional relationships, personal relationships, family, career prospects, and caused psychological and emotional trauma and suffering.

169.   By publishing and causing to be published false and defamatory information about Plaintiff, Defendant AIUSA defamed him under the common law of the District of Columbia and of the states in which Defendant AIUSA published defamatory statements.

170.   Defendant AIUSA's statements were actionable as a matter of law irrespective of special harm and/or its publication caused Plaintiff special harm; Plaintiff was treated and billed by a medical doctor for physical anxiety, hypertension, heart palpitations, and emotional distress directly and proximately caused by Defendant AIUSA's publication of false statements about him.

171.   Huang, Simon, Farrar, and Wyskida at all times alleged herein were acting within the scope of their employment or contract with broad authority to further Defendant AIUSA's mission. That assuming those duties within the scope of their employment, Huang, Simon, Farrar, and Wyskida used (a) organizational resources and (b) facilities to make false and defamatory statements concerning Plaintiff to third parties, affiliated and unaffiliated with the organization, including but not limited to, false and defamatory statements concerning Plaintiff to the media outlet Bloomberg Law. The agents of Defendant AIUSA who made false and defamatory statements in writing and/or orally included the following statements:

   a. On April 9, 2018 Defendant AIUSA told Plaintiff's supervisor Lin that Daphne Eviatar had complained about negative gender dynamics with Plaintiff. At a later date, Defendant AIUSA admitted no "negative gender dynamic" complaint was ever lodged by Eviatar. On or around May 2018, Plaintiff's supervisor Lin was told by Defendant AIUSA that two women colleagues complained about the Plaintiff's negative gender dynamics at a DEI hiring panel. At a later date, Defendant AIUSA admitted that there were no women who filed any complaints against Plaintiff. Defendant AIUSA's false and defamatory statements portrayed plaintiff as a misogynist man with negative gender dynamics with his female colleagues at work.

   b. On July 11, 2018, while at the investigation interview, Plaintiff asked: "I assume that your questions are based on allegations that were made by [the manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?" Ianantuoni falsely responded, in front

34

of Lynch and Rabenau, "Yes, sir. That's why we're here today." These
statements were false and defamatory.

c. On July 20, 2018, Defendant AIUSA issued a termination letter to
plaintiff where Defendant AIUSA claimed that a NY-based manager
"alleged that you made repeated unwanted sexual overtures toward her,"
including "attempting to kiss her after she asked you not to do so, and
pressing your body against her in an intimidating manner." Later, after
receiving all the investigation documents through the Union, it became
evident that none of these allegations were made by the NY-based
manager. Rather, these were false and defamatory claims by Defendant
AIUSA.

d. On July 23, 2018, a volunteer leader at Defendant AIUSA contacted
Huang to inquire about what happened with the Plaintiff. Huang told him
that "at the end it was a challenging situation but ultimately an easy
decision to make." In that same conversation, Huang said that Mr. Jarrar
was involved in "inappropriate conduct toward another employee." This
information is false and defamatory.

e. In or around August 2018, based on belief and information relayed to
Plaintiff on a later date, Defendant AIUSA told staff members that
Plaintiff was "caught red-handed sexually assaulting a young intern" and
that "witnesses were present." This information is false and defamatory
even according to Defendant AIUSA's own investigation findings.

f. In or around August 2018, based on belief and information, Huang
informed Defendant AIUSA board members that the incident leading to
Plaintiff's termination "was not a he said/she said situation, and there was
a witness(es) to some behavior." This information is false and
defamatory even according to Defendant AIUSA's own investigation
findings.

g. In or around August 2018, based on belief and information relayed to
Plaintiff on a later date, Defendant AIUSA told staff members that
Plaintiff was "caught red-handed sexually assaulting a young intern" and
that "witnesses were present." Sharing this false and defamatory
statements with AIUSA staff is highly offensive or embarrassing to a
reasonable person of ordinary sensibilities.

h. On January 16, 2019, the NLRB hearing took place. Defendant AIUSA
sought to impeach Plaintiff by introducing his termination letter. The
effort failed but the termination letter was entered into the hearing record.

Introducing these false and defamatory statements into the public record is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

i.  On March 23, 2019, Simon wrote to Ali via email, sharing with him Plaintiff's termination letter. Sharing these false and defamatory statements with the media is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

j.  On March 26, 2019, Defendant AIUSA emailed Ali false and defamatory statements.

k.  On or around March 26, 2019, Simon and Wyskida, on behalf of Defendant AIUSA, provided Bloomberg Law with false and defamatory statements.

l.  On March 28, 2019, in a letter to the EEOC, Defendant AIUSA shared false and defamatory statements.

m. On April 5, 2019, Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent false and defamatory statements to a Defendant AIUSA listserv.

n.  On April 15, 2019, Farrar emailed the listserv again with additional false and defamatory statements.


## COUNT IV

### INVASION OF PRIVACY
### FALSE LIGHT

172.  Plaintiff realleges and incorporates all the factual allegations above.

173.  By publishing and causing to be published false and/or misleading information about Plaintiff, Defendant AIUSA placed him in a false light under the common law of the District of Columbia and of the states in which Defendant AIUSA published such statements.

174.  Defendant AIUSA caused excessive publicity about a false or misleading statement, representation or imputation understood to be of and concerning the Plaintiff, and which placed Plaintiff in a false light within and outside of the organizational community to detached third parties in a manner that would be offensive to a reasonable person. That Defendant AIUSA reported to Bloomberg Law the following false statements concerning Plaintiff's unjust termination with the intent that the story receives mass publicity:

a. On April 9, 2018 Defendant AIUSA told Plaintiff's supervisor Lin that Daphne Eviatar had complained about negative gender dynamics with Plaintiff. At a later date, Defendant AIUSA admitted no "negative gender dynamic" complaint was ever lodged by Eviatar. On or around May 2018, Plaintiff's supervisor Lin was told by Defendant AIUSA that two women colleagues complained about the Plaintiff's negative gender dynamics at a DEI hiring panel. At a later date, Defendant AIUSA admitted that there were no women who filed any complaints against Plaintiff. Defendant AIUSA's false and/or misleading statements portrayed plaintiff as a misogynist man with negative gender dynamics with his female colleagues at work.

b. On July 11, 2018, while at the investigation interview, Plaintiff asked: "I assume that your questions are based on allegations that were made by [the manager], I just want to make sure -- is she alleging that I prevented her from leaving the room or kissed her -- are these things she's saying happened during that encounter?" Ianantuoni falsely responded, in front of Lynch and Rabenau, "Yes, sir. That's why we're here today." These statements were false and/or misleading.

c. On July 20, 2018, Defendant AIUSA issued a termination letter to plaintiff where Defendant AIUSA claimed that a NY-based manager "alleged that you made repeated unwanted sexual overtures toward her," including "attempting to kiss her after she asked you not to do so, and pressing your body against her in an intimidating manner." Later, after receiving all the investigation documents through the Union, it became evident that none of these allegations were made by the NY-based manager. Rather, these were false and/or misleading claims by Defendant AIUSA.

d. On July 23, 2018, a volunteer leader at Defendant AIUSA contacted Huang to inquire about what happened with the Plaintiff. Huang told him that "at the end it was a challenging situation but ultimately an easy decision to make." In that same conversation, Huang said that Mr. Jarrar was involved in "inappropriate conduct toward another employee." This information is false and/or misleading.

e. In or around August 2018, based on belief and information relayed to Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present." This information is false and/or misleading even according to Defendant AIUSA's own investigation findings.

f.  In or around August 2018, based on belief and information, Huang informed Defendant AIUSA board members that the incident leading to Plaintiff's termination "was not a he said/she said situation, and there was a witness(es) to some behavior." This information is false and/or misleading even according to Defendant AIUSA's own investigation findings.

g.  In or around August 2018, based on belief and information relayed to Plaintiff on a later date, Defendant AIUSA told staff members that Plaintiff was "caught red-handed sexually assaulting a young intern" and that "witnesses were present." Sharing this false and/or misleading statements with AIUSA staff is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

h.  On January 16, 2019, the NLRB hearing took place. Defendant AIUSA sought to impeach Plaintiff by introducing his termination letter. The effort failed but the termination letter was entered into the hearing record. Introducing these false and/or misleading statements into the public record is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

i.  On March 23, 2019, Simon wrote to Ali via email, sharing with him Plaintiff's termination letter. Sharing these false and/or misleading statements with the media is highly offensive or embarrassing to a reasonable person of ordinary sensibilities.

j.  On March 26, 2019, Defendant AIUSA emailed Ali false and/or misleading statements.

k.  On or around March 26, 2019, Simon and Wyskida, on behalf of Defendant AIUSA, provided Bloomberg Law with false and/or misleading statements.

l.  On March 28, 2019, in a letter to the EEOC, Defendant AIUSA shared false and/or misleading statements.

m.  On April 5, 2019, Defendant AIUSA's Chair of the Board of Directors Becky Farrar sent false and/or misleading statements to a Defendant AIUSA listserv.

n.  On April 15, 2019, Farrar emailed the listserv again with additional false and/or misleading statements.

## COUNT V

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

175.   Plaintiff realleges and incorporates all the factual allegations above.

176.   Defendant AIUSA engaged in conduct that was so outrageous in character, and so extreme in degree to lie to Plaintiff about the allegations against him by leading him to believe that there were rape allegations against him, and at a later date claiming there were false imprisonment allegations against him. It was further extreme and outrageous to knowingly, falsely and intentionally report to third persons that the Plaintiff engaged in misconduct of any sort.

177.   As a direct and proximate cause of Defendant AIUSA's conduct, Plaintiff required medical treatment from healthcare professionals. As a further direct and proximate cause of Defendant AIUSA's conduct, Plaintiff suffered humiliation, embarrassment, questioned integrity, shame, mortification, insecurity, severe and non-severe physical and emotional distress, mental anguish, pain and suffering, and such other non-economic damages proven at trial.

## PRAYER FOR RELIEF

178.   The violations of statutory law and the torts alleged above entitle Plaintiff to reinstatement, back pay, front pay, direct, consequential and punitive damages, including attorneys' fees, against Defendant AIUSA, including interest, according to evidence at trial; and such other and further relief that Plaintiff may be entitled to under law. Plaintiff seeks compensatory damages in an amount to be determined at trial and in excess of $1,000,000 US Dollars.

## JURY DEMAND

179.   Plaintiff demands trial by jury on all claims and issues so triable.

_____          July 31, 2019
Raed Jarrar, Pro Se                       Dated

**EXHIBIT 6**

D.C. Superior Court
08/12/2019 19:33PM
Clerk of the Court

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA

**RAED JARRAR**
Plaintiff

**Case Number: 2019 CA 04664 B**

vs

**AMNESTY INTERNATIONAL OF THE USA INC.**
Defendant

**AFFIDAVIT OF SERVICE**

Now comes, Nina Lew the undersigned and does hereby swear and affirm, affiant is a Private Process Server and disinterested Person over the age of eighteen. Affiant is not a party in the above styled cause and has a legal domicile of Silver Spring, MD.

I, Nina Lew certify that on, **8/6/2019**, at **1:39 PM**, I served a copy of the within *Summons and Amended Complaint, Initial Order and Addendum* upon the within named **Amnesty International of the USA, Inc. c/o CT Corporation System**, in the following manner,

**(xx)   Corporate/Partnership Service:** Through Personal Service of each document, a true copy to **Anthony Serrette, Intake Specialist**, whom based on information and belief affiant knew said individual to be Authorized Agent, a person authorized to accept service on behalf of **Amnesty International of the USA, Inc. c/o CT Corporation System**.

Said service was effected at the following location: **CT Corp., 1015 15th Street, NW, Suite 1000, Washington, DC 20005.**

I, Nina Lew describe the individual accepting service **Anthony Serrette** as follows: **Anthony Serrette** is a Black Male, approximately 60 yrs. old, with Black hair, approximately 5'6" and weighing 160 lbs.

I, Nina Lew certify that my statements, contained within the foregoing affidavit are true, correct and my free act and deed. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Sworn to and subscribed before me on
08/08/2019

_E. Torri Schaffer_
E. Torri Schaffer, Notary Public
Commission Expires 11/29/2020

E. TORRI SCHAFFER
Notary Public
State of Maryland
Montgomery County
My commission exp. November 29, 2020

45708

_Nina Lew_
Nina Lew
P.O. Box 18647
Washington, DC  20036
202-296-0222



# Department of Consumer and Regulatory Affairs

Home                                                                                    Edit Account | Log Out

## AMNESTY INTERNATIONAL OF THE USA - Initial File Number: 801425

Main        Reports        Trade Names        Governors

**Entity Info**

| | | |
|---|---|---|
| Business Name | | AMNESTY INTERNATIONAL OF THE USA |
| Suffix | | |
| Registration / Effective Date | | 3/31/1980 |
| Commencement Date | | 3/31/1980 |
| Entity Status | | Active |
| Foreign Name | NA | |
| Date of Organization | 3/31/1980 | |
| State | New York | |
| Country | USA | |

**Business Address**

| | | |
|---|---|---|
| Line1 | 5 PENN PLAZA | |
| Line2 | 16TH FLOOR | |

City   NEW YORK      State   New York      Zip   10001

**Agent**

Is non-commercial Registered Agent?                 No

Name                                 C T CORPORATION SYSTEM

Address

| | |
|---|---|
| Line1 | 1015 15th St NW |
| Line2 | Suite 1000 |

City   Washington      State   District of Columbia      Zip   20005

Email            CT-StateCommunications@wolterskluwer.com

Return to Home

**EXHIBIT 7**

## 2019 CA 004664 B JARRAR, RAED Vs. AMNESTY INTERNATIONAL OF THE USA INC HEP

- Case Type:
  Civil II
- Case Status:
  Open
- File Date:
  07/16/2019
- Action:
  Complaint for Employment Discrimination (Non-MPA) Filed
- Status Date:
  07/16/2019
- Next Event:
  10/18/2019

| All Information | Party | Event | Docket | Receipt | Disposition |

### Party Information

**JARRAR, RAED**
**- Plaintiff**

- Disposition
- Disp Date

| Alias |
|---|

| Party Attorney |
|---|
| • Attorney |
| • PRO SE |

**AMNESTY INTERNATIONAL OF THE USA INC**
**- Defendant**

- Disposition
- Disp Date

| Alias |
|---|

| Party Attorney |
|---|

### Events

| Date/Time | Location | Type | Result | Event Judge |
|---|---|---|---|---|
| 10/18/2019 09:30 AM | Courtroom 317 | Initial Scheduling Conference-60 | | |

### Docket Information

| Date | Docket Text | Image Avail. |
|---|---|---|
| 07/16/2019 | Complaint for Employment Discrimination (Non-MPA) Filed  Receipt: 433135  Date: 07/17/2019 | |
| 07/17/2019 | eComplaint. Filed. Submitted. 07/16/2019 13:03. ncv.<br>Attorney: PRO SE (999999)<br>RAED JARRAR (Plaintiff); | Image |
| 07/17/2019 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 10/18/2019  Time: 9:30 am<br>Judge: PUIG-LUGO, HIRAM E  Location: Courtroom 317 | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 07/17/2019 | Issue Date: 07/17/2019<br>Service: Summons Issued<br>Method: Service Issued<br>Cost Per: $<br><br>AMNESTY INTERNATIONAL OF THE USA INC<br>600 Pennsylvania ave se, 500<br>WASHIGNTON, DC 20003<br>Tracking No: 5000217567 | |
| 07/31/2019 | Amended Complaint Filed. submitted 07/31/2019 23:18. mw<br>Attorney: PRO SE (999999)<br>RAED JARRAR (Plaintiff); | Image |
| 08/12/2019 | Affidavit of Service of Summons & Complaint on Filed. submitted 08/12/2019 19:33. mw<br>AMNESTY INTERNATIONAL OF THE USA INC (Defendant); | Image |
| 08/12/2019 | Proof of Service<br>   Method  : Service Issued<br>   Issued    : 07/17/2019<br>   Service  : Summons Issued<br>   Served   : 08/06/2019<br>   Return   : 08/12/2019<br>   On      : AMNESTY INTERNATIONAL OF THE USA INC<br>   Signed By : Anthony Serrette<br><br>   Reason   : Proof of Service<br>   Comment  :<br><br>   Tracking #: 5000217567 | |

## Receipts

| Receipt Number | Receipt Date | Received From | Payment Amount |
|----------------|--------------|---------------|----------------|
| 433135 | 07/17/2019 | PRO SE | $120.00 |
| Total | Total | Total | Total |
| | | | $120.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|-------------|------|------------|
| Undisposed | | |